Charles **CARTER**, et al.

v.

**DISTRICT OF COLUMBIA, et al., Appellants,**

**Maurice Turner, Chief, Metropolitan Police Department, et al.**

Charles **CARTER**, et al., **Appellants,**

v.

**DISTRICT OF COLUMBIA, et al.**

Nos. 85–5672, 85–5673.

United States Court of Appeals, District of Columbia Circuit.

Argued April 7, 1986.

Decided July 3, 1986.

William J. Murphy, with whom Jeremiah C. Collins, William Alden McDaniel, Jr., and Kevin J. Baldwin, Washington, D.C., were on brief, for cross-appellants in No. 85–5673 and appellees in No. 85–5672.

Charlotte Brookins-Pruitt, Asst. Corp. Counsel, District of Columbia, with whom John H. Suda, Acting Corp. Counsel, and Charles R. Reischel, Deputy Corp. Counsel, Washington, D.C., were on brief, for cross-appellees in No. 85–5673 and appellants in No. 85–5672.

Before GINSBURG, BORK and BUCKLEY, Circuit Judges.

Opinion for the Court filed by Circuit Judges GINSBURG and BORK.

GINSBURG and BORK, Circuit Judges:

This case involves an episode of alleged misconduct on the part of police officers. Plaintiffs asserted both constitutional and common law tort claims against five police officers, the police chief, and the municipality. The case was tried to a jury. Directed verdicts were entered for the police chief and two of the officers on all claims, and for the city on the constitutional tort claim asserted against it. The jury found liability and awarded damages on the remaining claims, and the district court, after reducing the damage awards, entered judgments for plaintiffs. Both sides appealed.

We hold that the district court properly disposed of the constitutional tort claim against the municipality by directed verdict. (Plaintiffs have not appealed the other directed verdicts.) We further conclude that the trial judge erred in failing to restrict the means by which plaintiffs—in their attempt to prove the city's constitutional tort liability—presented allegations of incidents of police misconduct other than the incident in suit. This error necessitates a new trial of the claims submitted to the jury. Specifically, the district court allowed plaintiffs' counsel, over repeated objection, to read at length from newspaper articles and unadjudicated complaints involving officers other than the individual defendants in this case, and from the personnel files of the individual defendants. This mode of proceeding exposed the individual police officers on trial to the danger of unfair prejudice. The exposure was avoidable. Instead of allowing counsel to read directly and at length from press accounts, unadjudicated complaints, and personnel files, the trial court should have restricted counsel to brief factual summaries of the allegations, and concise inquiries of the witness on the stand.

In addition to these main rulings, our opinion includes other directions, in response to issues raised on appeal, to guide the district court on remand.

## I. THE EPISODE IN SUIT

The events that gave rise to this action commenced in the early hours of March 22, 1982. Each side describes the occurrences somewhat differently. We set out both accounts below.

### A. Plaintiff's Version

Plaintiffs Charles Carter and Aleta Parker testified that, at the time the episode opened, they were seated in Carter's automobile, then parked in an alley outside Parker's residence at 1440 W Street, N.W., in Washington, D.C. An unmarked car, with its lights off, entered the alley and moved slowly toward them. As the unmarked car pulled alongside Carter's car, three men in blue jeans and army jackets jumped out brandishing shotguns and pistols. One of the men pointed his gun at

plaintiffs and yelled: "Freeze. Don't move." Plaintiffs feared armed robbery or worse; Carter began backing his car out of the alley, while Parker dropped to the floor of the car screaming. As Carter backed onto 15th Street, three shots were fired in plaintiffs' direction; one struck the front passenger door near the place where Parker crouched on the floor.

Plaintiffs recounted that, once out of the alley, they sought to drive to the nearest police station. After traveling several blocks, they were approached by an unmarked vehicle equipped with what appeared to be a portable emergency light. Carter stopped his car. The same men who had confronted plaintiffs in the alley jumped out of the vehicle, pointing a shotgun and pistols. Two of the men pulled Carter from his automobile, threw him to the ground, struck him with the butt of a pistol, put his hands in handcuffs, and kicked and beat him. The third man directed a shotgun at Parker and commanded: "Bitch, get out of the car." Carter, prone on the pavement with hands cuffed behind him, endeavored to ask why plaintiffs were encountering such treatment. One of the men placed a pistol to Carter's head and threatened: "Nigger, shut the fuck up or I'll blow your mother fucking brains out."

Several police cars soon arrived on the scene and plaintiffs learned that their accosters were officers Vanderbloemen, Markovich, and Tarantella of the D.C. Metropolitan Police Department (MPD) Narcotics Task Force (NTF) "rip team." The police officers took plaintiffs to the NTF office, where it became apparent that, contrary to the NTF officers' assumption, Carter and Parker had not been engaged in a drug transaction when confronted in the alley. At that point, the apprehending officers asserted that Carter's automobile had struck Markovich as Carter backed out of the alley, and that Vanderbloemen, believing Markovich lay under the wheels of the car, had tried to stop the vehicle by firing his revolver. Based on that report, Carter was charged with assault on an armed police officer.

Parker stated that, during this time, she was taunted by NTF officers, accused of being a prostitute, and told by one of the officers that he would have fired his shotgun into Carter's car in the alley had another officer not been in the way. Eventually, Parker was informed that she would be held overnight because of a small quantity of marijuana found in her possessions.

The charge against Parker was dropped the next day, and Carter was released on his own recognizance. A little over a year later, the grand jury refused to return an indictment against Carter on the felony charge, and the matter was dismissed. Carter asserted that he was not notified of the dismissal, and remained unaware of it until some three and a half months later when he researched the Superior Court files himself. Although the charge against him had been dropped on May 5, 1983, Carter did not recover his automobile from the MPD until August 25 of that year.

### B. *Defendant's Version*

According to the testimony of officers Markovich and Tarantella, at about 3:00 a.m. on the morning of March 22, 1982, the officers observed plaintiffs sitting in a car with the light on in an alley at the rear of 1430 W Street, N.W. The officers proceeded into the alley in an unmarked car until almost parallel to Carter's automobile, at which point one of them observed what he believed to be drug paraphernalia in the parked car. The three officers then jumped out of their car; one went to the front, one to the rear, and one to the side of Carter's automobile. The officers did not dispute that one of them yelled, "Freeze. Don't move." They stated, however, that officer Tarantella banged on the passenger windshield with his police identification badge and said, "Police officers; open the door." As Parker dove to the floor, Tarantella screamed to the other two officers to get down. Officer Markovich, at the rear of Carter's car, then shouted, "Police!" and told Carter to turn his car off, but Carter, instead, put the car in reverse. This caused Markovich to fall.

Although Markovich rolled behind the police car, the other officers lost sight of him and thought he was being dragged out of the alley by Carter's car. Officer Vanderbloemen then fired at the car in an effort to stop it.

The three officers jumped back in their automobile and gave chase, advising other police units of the situation by radio. Once the officers pulled alongside Carter's moving vehicle, they displayed a police badge and shouted, "Police! Pull over!" Carter stopped, but then accelerated again; his automobile came to a halt only when the police car moved in front of the vehicle and blocked its way.

The officers admit that they pulled Carter from his car. The car then began to move, they said, because Carter had left it in gear; Parker, at that moment, attempted to get behind the steering wheel and drive away. Officer Tarantella pointed a shotgun at her, while officer Markovich jumped into the car and stopped it. The officers testified that during this time none of them witnessed any physical abuse of Carter. One of them did hear an officer, whom he thought to be Vanderbloemen, use profanity in addressing Carter.

Plaintiffs were arrested and taken to the NTF office at police headquarters. There, Carter gave an account of the occurrences, which made no reference to police abuse. Parker refused to provide any statement. Carter was charged with assault on a police officer; after marijuana was found in Parker's belongings, she was charged with possession of marijuana.

At headquarters, an investigation of the episode began immediately and automati-

cally, because Vanderbloemen had discharged his service revolver during the fray. Meanwhile, officer Tarantella had proceeded to the alley to assist investigators in taking photographs and drawing diagrams, and to search for drugs or drug paraphernalia. The search turned up no such items. Each of the three officers separately gave a written statement concerning the incident. The Director of the Department's Morals Division, Inspector Coligan, and the NTF officers' supervisor, Lieutenant Jones, then prepared reports for submission to Police Chief Turner.[1]

## II. DISTRICT COURT PROCEEDINGS

Plaintiffs Carter and Parker commenced this action on March 10, 1983; their complaint stated both constitutional and common law tort claims. Carter and Parker named as defendants the District of Columbia, Police Chief Maurice T. Turner, and five MDP officers: William F. Markovich, James Tarantella, Joseph G. Vanderbloemen, A.R. Moorin, and John J. Brennan. The individual officers, plaintiffs asserted, had violated plaintiffs' constitutional rights in numerous respects and were therefore accountable for damages under 42 U.S.C. § 1983 (1982).[2]

The officers, Carter and Parker maintained, dishonored plaintiffs' fifth amendment due process rights by engaging in this succession of acts: pointing weapons and shooting at them without cause; striking Carter with a pistol and kicking him in effecting his arrest; arresting, searching, and imprisoning plaintiffs without probable cause; and filing false reports and instituting unwarranted criminal charges against

1. There was no testimony at trial about Lieutenant Jones's conclusions because the district court upheld the claim of privilege the District asserted for his report during discovery. Transcript (Tr.) 582–83.

2. That section provides:
Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immuni-

ties secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.
The section originated in the Civil Rights Act of 1871, c. 22, § 1, 17 Stat. 13 (1871), and was amended in 1979 to include the District of Columbia, Pub.L. 96–170, § 1, 93 Stat. 1284 (1979).

plaintiffs. Carter and Parker further alleged that their arrest, search, and imprisonment violated fourth amendment constraints, and that the false reports and criminal charges violated sixth amendment limitations. In addition to the officers involved in the incident, the District and Chief Turner were answerable for constitutional wrongs, plaintiffs stated, under the doctrine set out in *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The MPD's failure adequately to train, supervise, investigate, and discipline police officers, Carter and Parker claimed, established as municipal custom or policy the District's tolerance of, or acquiescence in, the grave misconduct they experienced. Carter and Parker also stated common law claims against the police officers for assault and battery, false arrest, false imprisonment, and intentional infliction of emotional distress; they sought to hold the District liable for these common law torts under the doctrine of *respondeat superior.*

Officer Vanderbloemen failed to respond to plaintiffs' complaint, and the court declared him in default on June 9, 1983. *See* Fed.R.Civ.P. 55(a). The case proceeded to a jury trial on October 1, 1984. At the close of plaintiffs' case, on October 10, the district judge directed verdicts for MPD officers Moorin and Brennan, and Police Chief Turner, on all claims stated against them, and for the District of Columbia on plaintiffs' allegations of § 1983 liability. Plaintiffs do not contest on appeal the directed verdicts for Moorin, Brennan, and Turner.

The trial continued on the constitutional and common law claims against the three remaining officers, and against the District as their employer on the common law claims. On October 17, 1984, the jury returned its decision on the special verdict form the district judge had devised. Record Excerpts (R.E.) 47–52. The jury found against the individual defendants on all counts. It awarded Carter a total of $106,000 in damages, broken down on the special verdict form as follows: $40,000 under the fourth amendment heading;

$5,000 under the fifth amendment; $30,000 under the sixth amendment; $6,000 for assault and battery; $10,000 for false arrest; and $15,000 for intentional infliction of emotional distress. The amounts awarded Parker totalled $74,000: $40,000 under the fourth amendment hearing; $5,000 under the fifth amendment; $10,000 under the sixth amendment; $4,000 for assault and battery; $5,000 for false arrest; and $10,000 for intentional infliction of emotional distress. The district court entered judgments for these sums, directing recovery against the District of Columbia, along with the individual defendants, to the extent of the damages for the common law claims ($31,000 for Carter, $19,000 for Parker). R.E. 53–56.

In post-trial motions, defendants sought, alternately, judgment notwithstanding the verdict, a new trial, or reduced damages (a remittitur). The district judge recognized that the false arrest and fourth amendment damage awards returned by the jury were duplicative. He also recognized as erroneous his jury instruction on damage awards for constitutional torts. These two considerations led him to delete the $40,000 that the jury had awarded each plaintiff on the fourth amendment claims. In all other respects, he adhered to the rulings made at trial. *Carter v. District of Columbia*, No. 83–690, Memorandum Opinion and Order (D.D.C. Mar. 8, 1985) (hereinafter cited as Mem.Op.). By motion for reconsideration, plaintiffs requested reinstatement of the fourth amendment awards or, alternately, a new trial confined to the fourth amendment and false arrest claims. The district court denied this motion on April 16, 1985.

On May 8, in response to plaintiffs' motion for equitable relief, the court entered an order 1) declaring that plaintiffs' fourth, fifth, and sixth amendment rights had been violated, and 2) ordering the District of Columbia to place all records concerning plaintiffs' arrest and detention in a special sealed envelope, to be kept in a special locked file, accessible only upon authorization of the Chief of Police pursuant to court order. R.E. 71–73. The order, how-

ever, did not respond to plaintiffs' request for a direction that their seizure and incarceration on March 22, 1982, be officially declared "detentions" rather than "arrests."

Following entry of the May 8 order, defendants and plaintiffs both filed timely notices of appeal. Plaintiffs challenge: (1) the grant of a directed verdict for the District on the § 1983 municipal liability claim; (2) the elimination of plaintiffs' fourth amendment damage awards; and (3) the failure to include in the May 8 order a provision requiring official characterization of their seizure and incarceration as "detentions" rather than "arrests." Defendants seek review of: (1) the admission into evidence and protracted recitation at trial of allegations of misconduct by NTF officers in incidents other than the episode in suit; (2) the court's instructions regarding Vanderbloemen's default; (3) the denial of defendants' motion for a mistrial based on counsel for plaintiffs' closing argument to the jury; and (4) the refusal of the court to grant a directed verdict for the individual defendants on the claim of intentional infliction of emotional distress. We consider below each of these challenges.

III. THE PARTIES' CHALLENGES ON APPEAL

A. *The Directed Verdict for the District of Columbia*

■ In *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities are subject to liability under § 1983, not "based on theories akin to *respondeat superior*," *Oklahoma City v. Tuttle*, —— U.S. ——, 105 S.Ct. 2427, 2433, 85 L.Ed.2d 791 (1985) (plurality opinion), but on "a fault-based analysis." *Id.* at 2434. A city is answerable under *Monell* when an official policy or custom causes the complainant to suffer a deprivation of constitutional right. To hold a municipality accountable, the plaintiff must establish that the official policy or custom itself is "the moving force of the constitutional violation." *Monell*, 436 U.S. at 694, 98 S.Ct. at 2038; *Polk County v. Dodson*, 454 U.S.

312, 326, 102 S.Ct. 445, 454, 70 L.Ed.2d 509 (1981).

*Monell* involved an express municipal policy alleged to violate due process and equal protection limitations—a requirement that pregnant employees take unpaid leave from their city jobs while still willing and able to work. Police misconduct cases such as this one, by contrast, do not involve express statements of policy and "are not susceptible to such easy proof." *Oklahoma City*, 105 S.Ct. at 2436. To succeed, a plaintiff must show a course deliberately pursued by the city, "as opposed to an action taken unilaterally by a nonpolicy-making municipal employee," *id.* at 2439 (concurring opinion), and "an affirmative link between the [city's] policy and the particular constitutional violation alleged." *Id.* at 2436 & n. 8; *see Grandstaff v. City of Borger*, 767 F.2d 161, 169–70 (5th Cir. 1985).

The district court directed verdicts for the city and police chief in this case because it found the evidence insufficient to prove that a municipal policy or established custom of deliberate indifference to police misconduct caused plaintiffs to be subjected to a deprivation of constitutional dimension. We agree that plaintiffs failed to show fault on the part of the city based on a course its policymakers consciously chose to pursue.

Plaintiffs charged that the city and Police Chief Turner so neglected to train, supervise, investigate, and discipline police officers as to acquiesce in pervasive misconduct. They sought to demonstrate: (1) misconduct similar to the events in suit so widespread that it would not have persisted without the city's tacit approval; (2) the unfamiliarity of top officials with complaints lodged against police force members, indicating the city's lack of concern with the constitutional rights of persons who encounter police officers in the District; and (3) the inadequate response accorded to complaints of police misconduct, which signaled to police officers that their misbehavior would not be treated by the city as a matter of large concern.

We catalog and consider in turn plaintiffs' evidence under each of these three headings.

### 1. *Pervasive similar misconduct*

Plaintiffs urge us to include and consider under this heading, *inter alia*, bare complaints, pleadings, and press clippings, unsubstantiated by testimony, concerning alleged incidents of the use of excessive force by police officers. As the district court recognized, these hearsay items could show no more than notice to the city that allegations had been made. The items were admitted for that limited purposes, and "not for the purpose of establishing the truth of those [allegations.]" Transcript (Tr.) 997; *see also* Tr. 320B–320C, 425–26, 703–04. We therefore cull out such items as failing to show actual, as distinguished from merely alleged, occurrences.[3] We deal *infra* at 19–35 with the impropriety of the manner in which the "allegation" evidence was introduced.

Plaintiffs' proof of actual occurrences reduces to: (1) the testimony of witness Craig Scott that in May 1982, police officers beat him repeatedly both at the scene of his arrest and after taking him into custody (Tr. 643–53); (2) the death of prisoner Darrell Rhones in police custody in December 1983, and the D.C. Medical Examiner's conclusion that the death was caused by a "choke-hold" administered by police officers (Tr. 756–59); (3) the death of seven persons, acknowledged by Police Chief Turner, in incidents involving D.C. police in a two-month period in late 1983 and early 1984 (Tr. 837–39);[4] (4) a fine imposed against officer Vanderbloemen for striking two persons without cause, and improperly arresting one of them (Tr. 727–40); (5) the reprimand of officer Markovich for looping a belt around the neck of a prisoner and taunting him (Tr. 562–63);[5] and (6) the police chief's admission that officer Anderson had kicked a handcuffed suspect (Tr. 964–69).[6]

This catalog of disquieting events is not sufficient to demonstrate a pervasive pattern of police officer indulgence in the use of excessive force, persisting in the District because of the MPD's tacit approval. We can glean nothing from the seven deaths acknowledged by Police Chief Turner, because plaintiffs presented no detail at all on these incidents. The remaining occurrences are scattered and do not coalesce into a discernible "policy." If the evidence plaintiffs presented here were adequate to make out a § 1983 case, then practically every large metropolitan police force, it would seem, could be targeted for such liability.

It is instructive to contrast with the case at hand a paradigm case of pervasive misconduct subjecting a municipality to § 1983 liability. In *Webster v. City of Houston*, 689 F.2d 1220 (5th Cir.1982), *vacated*, 735 F.2d 838 (5th Cir.) (en banc), *aff'd in part and rev'd in part*, 739 F.2d 993 (5th Cir. 1984) (en banc), 75–80% of the municipality's police officers, the evidence showed, carried "throw down" guns: "weapon[s] which police officers, having killed (or wounded) an unarmed suspect, [could] put

---

3. We place in this category several complaints filed against officer Vanderbloemen (Tr. 709–16, 721–41); two complaints against officer Moorin (Tr. 421–22); several lawsuits filed against police officers (Tr. 744–55), including officers Moorin (Tr. 744–46), and Tarantella (Tr. 319–320E); and newspaper reports of police misconduct (Tr. 805–995).

4. These three items concern events that postdate the March 22, 1982, episode in suit. The district court considered the incidents sufficiently close in time to warrant admission, and defendants raised no objection on that score.

5. The officer who had reported the Markovich prisoner-taunting incident later found his night-

stick ground into sawdust filling an envelope placed in his locker. Tr. 562–64.

6. Plaintiffs also point to the 21 citizen complaints, out of 1315 filed, sustained by the Civilian Complaint Review Board (CCRB) during the period August 1982 to February 1984, and referred to Police Chief Turner for action. Brief of Appellants at 29–30; Tr. 866–68. The record does not show, however, which, if any, of the 21 complaints involved misconduct similar to the abuses alleged by plaintiffs; it reveals only— and without detail—that some 428 of the 1315 complaints alleged the use of excessive force. Tr. 863.

at his side to justify the shooting." 689 F.2d at 1222. We do not mean to suggest by our citation to *Webster* that a numerical standard controls the determination whether incidents of wrongful behavior cumulatively show a pattern amounting to a custom or policy. Egregious instances of misconduct, relatively few in number but following a common design, may support an inference that the instances would not occur but for municipal tolerance of the practice in question. We can say with assurance, however, that the assorted actual instances of misconduct demonstrated in this case do not line up to compose a common or widespread pattern of police misbehavior adequate to establish § 1983 municipal liability.

### 2. *Top officials' unfamiliarity with complaints*

Police Chief Turner, plaintiffs showed, was unaware of several civil rights suits naming him as a defendant[7] and Lieutenant Jones, NTF supervisor, did not know of several citizen (administrative) complaints and lawsuits lodged against officers in his unit. Administrative complaints and lawsuit allegations are not readily available for a supervisor's surveillance, plaintiffs observed. Pending lawsuits are not noted in police officers' personnel files; moreover, the personnel files of NTF officers are not kept at the NTF. These facts, plaintiffs urge, support an inference of deliberate indifference by upper echelon officials to police misconduct that dishonors the constitutional rights of the citizenry.

Again, we find plaintiffs' case too thin to warrant submission to a jury. Chief Turner explained that all court complaints against officers, including the Chief, upon service, are referred to the MPD's General Counsel, who does keep the suit "on file," but petitions the Corporation Counsel to provide the officer's representation. Tr. 901, 989. Complaints of all kinds eventually go to the Office of Community Relations

for review. That Office watches out for officers who "repetitiously get complaints," or need "closer supervision," "in-service training," or "to get off the force." Tr. 989. By law, the filing of a complaint may not be noted in an officer's personnel file, but adverse action taken against him is recorded there. Tr. 901, 989. Because NTF officers are only "detailed" to that unit, their files remain in their "home districts." Tr. 776–77.

The personnel and complaint handling procedures brought out at trial may fall some distance from the ideal, but, as the district court correctly indicated, they do not spell a deliberate "see no evil" policy.

### 3. *Inadequate attention to complaints*

Through statistical proof and evidence of specific instances, plaintiffs attempted to show that complaints of police brutality would languish at the MPD, so that officers could act in derogation of constitutional rights without fear of sanction. Plaintiffs' statistics, however, were too general to prove any pattern or policy, and their specific instances were too scattered and lacking in detail to build a case. We describe first plaintiffs' numerical submissions, and then consider the specific instances they presented.

Plaintiffs offered the following figures: (1) from 1974 to 1979, officers were exonerated in 92% of the misconduct investigations MPD conducted; (2) in 1983, the MPD Service Weapon Review Board cited 26 officers for using weapons unjustifiably, but the police chief took adverse action against only one of them and merely reprimanded the others; and (3) of 21 cases in which the Civilian Complaint Review Board (CCRB) recommended adverse action against police officers since 1982, the police chief took such action in only five cases. These statistics are conspicuously wanting in detail. They do not speak for themselves. The first item, for example, lumps together all

---

**7.** We do not count it remarkable that the head of a large municipal police force would "peruse" complaints naming him as a defendant only "very briefly," and lack familiarity with their

specific allegations. *See* Tr. 901. Chief Turner estimated that from 30 to 50 federal and a like number of local lawsuits were filed each year naming him as defendant. Tr. 900.

investigations of whatever kind; it tells us nothing separately or specifically about excessive force complaints. The second does not inform us of the nature of the cases in which service weapons were improperly discharged. Concerning the CCRB's recommendations, Chief Turner explained that in 16 cases, the necessary proof was missing; he faced conflicting versions of the events, no fact findings, and no confirmation of the complainant's account. Tr. 867–68.

Turning to specific instances put forward by plaintiffs to show slack or superficial investigation, two involved officer Vanderbloemen. One was a charge that he had unjustifiably hit two persons with a nightstick; the other was a complaint that he had verbally abused an individual. The first took two years to conclude and ended with the Chief's reduction of the recommended penalty from 15 days suspension to five. The second resulted in a reprimand letter, although a more severe course had been recommended to Chief Turner. Explaining at least part of the delay in the first case, the MPD had initially referred the matter to the U.S. Attorney for prosecution—hardly a mild response to the complaint. The reduction of the suspension sanction occurred in that case, Chief Turner testified, because the complainants had not been located to testify under oath. Tr. 894–95.

Plaintiffs referred to other instances, including the death of Darrell Rhones in custody, the abuse of a prisoner by officer Anderson, and witness Scott's testimony about physical abuse upon his arrest. The first two matters, however, were referred to the U.S. Attorney for prosecution, again, not a tepid response, and Anderson ultimately was indicted for obstruction of justice. Tr. 970–71. Scott filed a lawsuit complaining of his treatment, and MPD responded in accordance with its standard

practice; plaintiffs submitted no evidence on the outcome of Scott's action.

The very cases on which plaintiffs place primary reliance, we conclude, show what is missing here. In *Fiacco v. City of Rensselaer*, 783 F.2d 319 (2d Cir.1986), plaintiff presented a parade of witnesses, each an excessive force complainant before the police chief himself, each relating first hand and in detail both the brutal incident and the chief's stock response.[8] *Grandstaff v. City of Borger*, 767 F.2d 161 (5th Cir.1985), involved a "catastrophic" incident. The entire night shift of the city police had opened fire and recklessly killed an innocent man. In the aftermath, "there were no reprimands, no discharges, and no admissions of error. The officers testified at trial that no changes had been made in their policies." *Id.* at 171. *Fiacco* and *Grandstaff* presented concentrated, fully packed, precisely delineated scenarios. The pattern or policy a trier could see etched sharply in those cases simply is not discernible here. Instead, the record shows scattered fire smouldering in smoke from which no policy or custom emerges.

### 4. Conclusion

██ The district judge correctly stated the governing law: to establish municipal liability under § 1983, it was plaintiffs' burden to show a "persistent, pervasive practice of the city officials and Police Chief Turner, which, although not officially adopted, was so common and settled as to be considered [a custom or policy]." Tr. 1136. He also correctly applied that law in granting defendants' motion for directed verdicts on the *Monell* municipal responsibility claim: the § 1983 claim against the city fails for want of proof of a persistent, pervasive practice, attributable to a course deliberately pursued by official policy-makers, one that caused the deprivation of con-

---

**8.** The police chief in that case personally investigated a series of complaints over a two-year span, did not assign anyone else to participate in those reviews, never held a hearing, seldom went beyond superficial questioning of the accused officers, and never found occasion even to reprimand an officer. On that strong record, the court concluded there was a jury question whether the chief's handling of complaints indicated an official policy to condone, through deliberate indifference, the use of excessive force.

stitutional rights plaintiffs experienced. *See* Tr. 1147.

### B. *Admission of Allegations of Other Incidents of Misconduct*

■ In support of their ultimately unsuccessful § 1983 claim against the District and Chief Turner, plaintiffs introduced, at length and verbatim, allegations of NTF misconduct contained in administrative complaints, pleadings in lawsuits, and newspaper articles. This evidence was offered not to establish that the incidents alleged actually occurred, but to test the familiarity of Chief Turner and Lieutenant Jones with the allegations, and to gauge their response to those claims with which they were familiar. Defendants contend that the trial court committed an abuse of discretion in permitting the unrestrained introduction of inflammatory "allegation" evidence. The error was not rendered harmless, defendants maintain, by the directed verdicts granted in favor of the District and police chief on § 1983 liability. Rather, they claim, admission of the evidence subjected the individual defendants to unfair prejudice, thus the error necessitates a new trial to determine the liability of defendants Markovich and Tarantella and the appropriate amount of damages against defaulting defendant Vanderbloemen. We agree.

The allegations evidence admitted in the district court falls roughly into two categories: evidence of incidents involving the individual defendants. We consider separately the admission of each type of evidence.

1. *Evidence concerning officers other than individual defendants* —Over defendants' objections, the trial court admitted into evidence numerous newspaper articles and complaints filed in lawsuits alleging misconduct by NTF members other than the individual defendants. This evidence was admitted on the issue of the District of Columbia's municipal liability under § 1983. Defendants claim that the evidence in question exposed them to a great risk of unfair prejudice that substan-

tially outweighed any probative value and, therefore, should not have been admitted. Though the district court's decision on a matter of this kind may not be overturned absent abuse of discretion, *United States v. Foskey*, 636 F.2d 517, 525 (D.C.Cir.1980), we conclude that the court committed such an abuse in this case.

Federal Rule of Evidence 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed.R.Evid. 403. The Advisory Committee Notes instruct that "[i]n reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness of a limiting instruction." *Id.* Notes of Advisory Committee on Proposed Rules. We think that, as the evidence was admitted, the judge gave adequate, if not model, instructions as to the limited purpose for which the evidence should be considered.

These instructions alone, however, were insufficient to guard against the danger of unfair prejudice. The Advisory Committee Notes continue: "The availability of other means of proof may also be an appropriate factor." *Id.; accord United States v. LaVelle*, 751 F.2d 1266, 1278 (D.C.Cir.) (taking into account whether "the manner in which the government presented the evidence guarded against unfair prejudice"), *cert. denied*, — U.S. —, 106 S.Ct. 62, 88 L.Ed.2d 51 (1985); *United States v. Foskey, supra*, 636 F.2d at 524 n. 6. In this case, there were certainly other ways the evidence could have been admitted so that the relevant aspects were retained and the prejudicial aspects minimized.

The district judge permitted plaintiffs' counsel repeatedly to read highly inflammatory accounts of police misconduct to the jury. For instance, plaintiffs' counsel read extensively from newspaper accounts during the questioning of Police Chief Turner:

Q: I haven't asked you about that yet.

Let me ask you, on the very first page in the third column on the right, there's a description of Officer Larry Greene who said that "a dozen officers have made hundreds of Sasquatch arrests in the last year and records show that there were 62 arrests on eight days alone. The officer have dubbed their $10 fine that's charge[d], 'The Northwest Side Tax.' They call their hall of justice '3–D Court.' They enact the law on the street, then prosecute and sentence in the cellblock of their station, with no judges or lawyers to get in the way.["]

" 'What about their constitutional rights?' a colleague once joked with Greene, as street-cop justice was about to be administered."

"His answer was—

MR. THIGPEN: Objection, your Honor; no question on the floor.

MR. MURPHY: I'm going to ask the Chief a question after I've described—

THE COURT: He's going to ask a question after he reads the preamble to his question. I'll overrule the objection.

BY MR. MURPHY:

Q. To continue, Officer Greene responded, " 'What Constitution' came the reply. 'That only goes for straight people, ain't it?' "

Now, did you with the particular reference to your statement earlier that these things were investigated, was Officer Greene's action investigated?

A: Yes, sir, all of the actions in here were investigated by the Internal Affairs Division.

Q: Did Officer Greene deny that he ever made such statements?

A: Yes, sir, he did.

Q: And, it would be your position, wouldn't it, that it would be inappropriate for a police officer to take that kind of attitude toward the constitutional rights of citizens?

A: It's a violation of the law for a police officer to do that. A police officer has no authority to do anything like that.

. . . .

MR. MURPHY: Now, let me direct your attention to the very end of the article, Chief.

May I approach the witness, Your Honor?

THE COURT: Yes, you may.

BY MR. MURPHY:

Q. In the end of the article there are several paragraphs dealing with one of the individuals who is arrested in a particular Sasquatch raid and the description is as follows:

"The third prisoner, frail and elderly, sits quietly. His hands shake slightly as the cuffs are removed. He unfolds a wallet and gives Officer Greene some identification. His name is Walker. He says he is a laborer who had been waiting to catch a bus to visit a relative when the police arrested him.["]

"Greene notes that the man is 57 years old. He believes Walker, 'not a needle mark on him, and junkies live that long,' Greene observes. It appears they caught an innocent bystander in their Sasquatch. Greene practically orders one of the other prisoners to help Walker 'you pay him out.'["]

"The other prisoners shakes his head. 'Ain't this something. I'm going to call the Better Business Bureau.' But he agrees to pay Walker's $10 fine in addition to his own. No matter who pays, Walker's name remains on the arrest book."

Now, Mr. Walker went on to say, "I'm thankful that I'm out, sir." He has not realized that in his case merely standing in the wrong place at the wrong time in the 3rd District resulted in a permanent arrest record."

Now, Chief Turner, was this one of the incidents that you investigated or the Internal Affairs Division investigated?

A: Yes, sir, it was. There was no Walker on the arrest record. The reporters were talked to personally by me. They would not produce any identification. We could not locate a Walker. We could not find a Walker. We could not find

any incident. We could not corroborate this. It was unfounded.

Tr. 812–16.

During the testimony of the preceding witness, Lieutenant Jones, counsel for the defendants, Mr. Thigpen, attempted without success to have the court limit the use of newspaper articles:

MR THIGPEN: I have to object to any recitation from any newspaper article, in that it simply is just not—it's not authenticated. There's no foundation for it. It's clearly hearsay, double hearsay. And it's certainly prejudicial, Your Honor, because again, the jury is presented with naked allegations that may or may not be unfounded.

. . . .

THE COURT: We had this earlier. I do believe, as long as they have a reasonable basis for their question, that they can ask him whether or not he's aware of such claims. If he says he's not, that ends it. If he says "Yes, I'm aware of it and have done the following things about it," he can testify as to what he's done. But I'll overrule your objection to the use in a question of facts alleged to exist in a newspaper article to see whether or not he's familiar with it.

. . . .

MR. THIGPEN: Your Honor, let me submit that I believe in order to do it without prejudice, that the officer ought to be shown the newspaper article, whether he recognizes the allegations in the newspaper article, without it being read to the jury, thereby avoiding the prejudicial effect.

THE COURT: If he doesn't know it, you're saying?

MR. THIGPEN: Exactly.

MR. McDANIEL: Well, I think, Your Honor, I'm entitled to ask a question about a matter that's been in the newspaper that I learned from a public source.

THE COURT: In the context of 1983 claims, where it's been published in the largest newspaper in the District of Columbia—I assume its the Washington Post you're reading from?

MR. McDANIEL: Yes.

THE COURT: I think it's fair to ask him whether or not he's aware of this claim. He can simply deny it. I'll overrule the objection as to the use of newspapers for cross-examination of Witness Jones.

Tr. 763–65.

The trial judge plainly lapsed in failing to restrict the method of using newspaper articles so as to avoid the risk of unfair prejudice to the defendants. The "evidence" relevant to establishing the District's § 1983 liability was not the details of allegations contained in the newspaper articles, but was whether or not Lieutenant Jones and Chief Turner were familiar with the fact of such allegations and, if so, had conducted investigations with regard to them. This could be ascertained with minimal risk of unfair prejudice by permitting only brief factual summaries of the allegations, which omit most of the color, to be read to the witnesses and by limiting questions to concise inquiries such as: "Are you familiar with these allegations? What, if any, actions were taken in response to them?"

Requiring plaintiffs' counsel to proceed in this fashion would not have impaired plaintiffs' ability to develop evidence necessary to establish municipal liability under § 1983. The only effect of such restriction would have been to guard against the danger of unfair prejudice to the defendants. Under these circumstances, we find what was said in *United States v. James* to be equally applicable here: "Given the slight probative force of this evidence, and its obvious potential for prejudice, we perceive no balance on which it properly could have been admitted." 555 F.2d 992, 1001 (D.C. Cir.1977). The specific accounts of allegations contained in newspaper articles were themselves of no probative value and the judge's decision to permit such accounts to be read verbatim to the jury constituted a conspicuous failure to exercise proper control, amounting to an abuse of discretion.

2. *Evidence concerning individual defendants*—Defendants also objected to the

admission of evidence of "other crimes, wrongs, or acts" allegedly committed by the individual defendants. Specifically, the defendants objected to the trial court's admission into evidence of the personnel files of the officers involved. These files contained highly inflammatory complaints and allegations that were unquestionably capable of causing unfair prejudice to the defendants. Here again, we conclude that the trial court abused its discretion, this time by admitting inflammatory material from the defendants' personnel files.

Federal Rule of Evidence 404(b) provides: Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Fed.R.Evid. 404(b). It is true that the allegation evidence was not admitted to prove the character of the defendants, but to test the familiarity of Chief Turner and Lieutenant Jones with the allegations. Nevertheless, as the Advisory Committee Notes point out, "[n]o mechanical solution is offered. The determination must be made whether the danger of undue prejudice outweighs the probative value of the evidence *in view of the availability of other means of proof* and other factors appropriate for making decisions of this kind under Rule 403." Fed.R.Evid. 404(b) Notes of Advisory Committee on Proposed Rules (emphasis added).

The judge once more failed to consider alternative methods of proof that would have avoided the danger of unfair prejudice to the defendants. After admitting Officer Vanderbloemen's personnel record over defendants' objection, the district court permitted plaintiffs' counsel to proceed as follows. Counsel handed the witness, Lieutenant Jones, a copy of the personnel record and proceeded to read, or have the witness read, highly prejudicial citizen complaints and performance evaluations to the

jury. When defendants' counsel objected that plaintiffs' counsel was simply reading to the jury without asking questions of the witness, the trial judge overruled the objection, stating that there is no other method of proving a § 1983 claim. The following excerpts from the trial transcript are representative of the approach permitted by the district court:

Q: Okay. Over onto the next page, please, Lieutenant. This is a citizen complaint report and you see in the upper, right-hand corner in writing "Vanderbloemen"?

A: Yes, sir, I do.

Q: And the date of this report is March 11, 1981; is that correct?

A: That's correct, sir.

Q: And this is by a Cole Cummings, I believe?

A: That's correct.

Q: And he gives his business as retired?

A: That's correct, sir.

Q: And the nature of the complaint against Officer Vanderbloemen is that he kicked him and called him a nigger. Do you see that?

A: Yes, sir, I do.

Q: And the location of this incident was at 14th and W Streets. Do you see that, Lieutenant?

A: Yes, sir.

Q: It says here that:

"Mr. Cummings had stopped for a red light at 14th and W Streets, Northwest. The next thing I knew a white police officer tapped on my window and asked me to get out. I said, 'as soon as the light turns I'll pull over to the side because there are a lot of cars behind me.' He said, 'get out now.' I opened the door and he called me a black nigger and then snatched me by my right wrist and pulled me out of my car onto the ground. Then he kicked me in my right knee with his right foot shoe on. Then I got up off the ground and he pulled me around the back of the car. Then he asked me for my driver's license and registration and I gave it to him. He said, 'every time I see you on the street I'm going to give

you a ticket because I own the street.' I asked him for his desk sergeant's name and he said, 'it ain't going to do you no damn good.' Then he pushed me against the car with his stick. Then he wrote me the ticket and then he drove off."

Is that what that says?

A: Yes, sir.

Q: Okay. Over onto the next page please. We have a citizen's complaint report here and in the upper, right-hand corner you'll see the name Vanderbloemen. Do you see that?

A: Yes, sir, I do.

Q: This is dated 12/10/1980?

A: That's correct, sir.

Q: And this is by Delores Peterson?

A: That's correct.

Q: She lives 1440 N Street, Northwest?

A: That's correct, sir.

Q: And her complaint is that:

"On Saturday morning about 3:30 a.m. an officer (white) came to my apartment to investigate a complaint of loud music (stereo). The officer entered my apartment and moved my stereo about two feet and reached down to the socket and cut the plug. The officer then told me that he would 'like to whip my tail.' He left the premises after about five minutes. I considered the officer's conduct rude and uncouth." Is that what that says?

A: Yes, sir.

THE COURT: Mr. McDaniel, do you have much more to go on this witness?

MR. McDANIEL: Fifteen minutes, Your Honor.

THE COURT: All right. Come to the bench, gentlemen, for a minute, please. (At the Bench:)

. . . .

MR. THIGPEN: While we are here let me for the record—I want to object to the kind of questions that are being posed to the Lieutenant. These are not questions. There are recitations of other people's statements.

There's absolutely no foundation for them. The testimony with respect to in-cidents with respect to Mr. Vanderbloemen are being allowed to be read to the jury by someone who wasn't even a supervisor at the time. I think this is so prejudicial. There's absolutely no foundation for it whatever.

. . . .

THE COURT: I understand the concern was the prejudicial effect of reading each single incident to him and he says yes, and you have got to read it to the jury. I don't know any other way you get these in except to tell him to read the entire file. Now he's read it. Does he know anything about Vanderbloemen and then you can go back through each one again. I don't think it makes any difference. There's not a better way right now probably to get this evidence in.

MR. McDANIEL: I only have one or two or three more I would say in any event.

THE COURT: In any event I don't believe it's so prejudicial doing it this way. I will allow it in at this time. I will deny the motion to strike at this time.

Thank you. We'll take a short recess, come back and finish up with him and then recess for the day.

. . . .

Q: The next to the last paragraph, Captain High states,

"A careful review of the evidence shows that Officer Vanderbloemen claims in his various statements that his use of baton was justifiable as self-defense and the arrest that he made was lawful. However, other evidence gathered indicates his actions were improper."

Do you see that?

A: Yes, sir, I do.

Q: Over on the next page, Captain High says that the statements given by Officer Simpson and various witnesses "show that Officer Vanderbloemen intimidated Ms. Brown into fighting with him, and then struck her with his baton in apparent retaliation. These statements further show that the officer then turned on Ms. Jackson and struck her with his baton, as she faced away from him

presenting no danger. Ms. Jackson was then arrested by Officer Vanderbloemen in an apparent attempt to validify his use of baton, even though there was no evidence of any crime committed by her."

Do you see that?

A. Yes, sir, I do.

. . . .

Q: Now, do you recall at any time, Lieutenant, reviewing Officer Vanderbloemen's personnel file to look at these various charges we've talked about?

A: No, sir, I don't.

Q: Do yo recall at any time whether any officials, any supervisors of Officer Brennan in the Narcotics Task Force, reviewed Officer Brennan's files to look at this material?

A: I don't know, sir.

THE COURT: Officer Vanderbloemen's.

MR. McDANIEL: Officer Vanderbloemen. Thank you, Your Honor.

BY MR. McDANIEL:

Q: I'm sorry, Lieutenant. Make sure we're clear on that. Do you recall whether any of the supervising officials of the Narcotics Task Force ever reviewed Officer Vanderbloem's files concerning any of these events?

A: I don't know, sir.

Tr. 713–16, 718–20, 733, 740.

Permitting the jury to consider the complaints and accounts of misconduct contained in the personnel files of Officer Vanderbloemen and the other defendants presented a grave danger of unfair prejudice. Following the reading of account after account of alleged misconduct by the defendants, there was a significant risk that the jury would conclude that the evidence established the bad character of the defendants and that the defendants were likely to have acted in the same way on the night in question. Use of the "other acts"

evidence for this purpose is, of course, precisely what Rule 404(b) proscribes.[9]

Though the personnel file evidence was admitted to establish the District's § 1983 liability, the evidence, in the form in which it was admitted, was of little or no probative value for this purpose. In questioning Lieutenant Jones, plaintiffs' counsel sought to learn whether the witness or any other NTF officials had ever reviewed the allegations of misconduct contained in Vanderbloemen's personnel file. (Plaintiffs sought this information in their attempt to establish a pattern or practice by the District of Columbia of permitting such conduct.) As in the case of the allegations contained in newspaper articles, this information could have been elicited without admitting the file into evidence or reading its contents aloud to the jury. Instead, the district court should have permitted only brief, neutral summaries to be read to the witness, with questions again properly limited in scope.

The risk of unfair prejudice to the defendants could have been reduced further had the judge instructed plaintiffs' counsel not to identify the officers named in the allegations when those officers were also defendants in the case. Though the plaintiffs tried to prove § 1983 municipal liability based, in part, on the District's retention of Vanderbloemen despite the many complaints lodged against him, Vanderbloemen's identity is not relevant for this purpose. Rather, it is relevant only that there was an officer whom the NTF had retained and against whom complaints were lodged. The only effect of identifying that officer as Vanderbloemen was to subject the defendants to the risk of unfair prejudice with other bad acts evidence. *See supra* at 126–29.

9. Items from the personnel files of the individual defendants included certain incidents, the occurrence of which the District concedes: (1) Vanderbloemen's striking two persons without cause and his improper arrest of one of them (Tr. 727–40); (2) Markovich's taunting of a prisoner (Tr. 562–63); (3) Tarantella's mistreatment of a police dog (Tr. 300–01). Once the § 1983 municipal liability claims failed, the probative value of this evidence, if it retained any, would seem clearly outweighed by the danger that the jury would infer from it the bad character of the individual defendants, and thus the likelihood that they acted badly during the episode in suit. Use of "other acts" for this purpose is also forbidden by Rule 404(b).

The evidence of the defendants' other acts and misconduct, in the form admitted, was of scant, if any, probative value for any permissible purpose. Therefore, we think that the risk of unfair prejudice more than substantially outweighed the evidence's probative value. The district court's apparent conclusion to the contrary failed to take into account the availability of other means of proof and was therefore an abuse of discretion.

3. *Harmless error*—Having concluded that the trial judge abused his discretion under Rules 403 and 404(b), we also think that these errors cannot be characterized as harmless. The errors therefore require a new trial.

■ The "harmless error" rule is incorporated in 28 U.S.C. § 2111 (1982), which provides: "On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties." "In determining whether an error had such a substantial effect this court will look to three factors. If (1) the case is not close, (2) the issue not central, or (3) effective steps were taken to mitigate the effects of the error, the error is harmless." *United States v. Hernandez,* 780 F.2d 113, 119 (D.C.Cir.1986) (*citing Gaither v. United States,* 413 F.2d 1061, 1079 (D.C.Cir.1969)).

In this case, none of these factors weigh in favor of a finding of harmless error. First, considering the evidence only for the purposes for which it was properly admitted, the case can be characterized as close. The evidence on both sides consisted almost entirely of eyewitness testimony by the parties involved. As pointed out earlier, the parties' accounts of what happened differ substantially in many material respects. *See supra* at 118–20. The testimony was such that the jury could have found for either side. In this circumstance, we cannot say with confidence that the extensive evidence admitted tending to show the bad character of members of the NTF in general, and the defendants in particular,

did not "substantially sway[ ]" the jury's verdict. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

Second, whether the defendants engaged in misconduct with respect to their arrest of the plaintiffs was, of course, the overarching question in the case. Admission of the "allegations" evidence was, therefore, very likely to affect the jury's consideration of virtually all issues in the case.

Third, although the trial judge gave limiting instructions as the evidence was admitted, these instructions could not mitigate the effects of the error. The only "evidence" probative of any issue properly in the case was whether Chief Turner and Lieutenant Jones failed to properly supervise and discipline members of the NTF. Determining their awareness of allegations of misconduct by such members was part of this evidence. The judge's limiting instructions went only to the proper uses of *this* evidence. As discussed, the specific contents of the newspaper articles, citizen complaints, and personnel files were not admissible for *any* purpose. Thus, the limiting instructions could not cure the errors committed with respect to the manner in which the evidence was admitted.

In addition, the district court refused to take one step that might have mitigated somewhat the effects of its errors. At the close of the case, after the judge had ordered a directed verdict for the District on the issue of § 1983 liability, the defendants requested that the jury be instructed to disregard all evidence:

(a) related to any other incident or alleged incident other than the incident involving the plaintiffs;

(b) related to other civil proceedings or allegations made therein;

(c) news accounts of newspaper articles, of any kind;

(d) related to any prior or subsequent actions of either the present or former defendants, such as evidence obtained from personnel files;

(e) evidence related to hearings or testimony before the City Council of the District of Columbia, on any subject;

(f) evidence related to subsequent processing of criminal actions by the United States Attorney's Office and related to the plaintiffs, and any developments with regard thereto, including any claimed legal expenses;

(g) evidence related to any subsequent Metropolitan Police Department reviews of the incident involving the plaintiffs or any other incidents.

The judge refused to give this instruction or any part of it, stating that he would give a general instruction "without going further to delineate every single claim and every single question asked by counsel or answer given throughout the two weeks of trial. I don't think there's any feasible way of possibly doing that in the context of this case. I believe a general instruction following the limiting instructions I gave each time when the evidence came in over the defendants' objection will suffice to adequately apprise the jury." Tr. at 1435–R. Thus, instead of giving the instruction requested by the defendants, the judge instructed the jury as follows:

Now, ladies and gentlemen, I am instructing you you are to base your deliberations in this case only upon the evidence properly before you. Because this case has been somewhat complex during the trial there was principally in the plaintiffs' case in chief considerable evidence offered which at that time I admitted under a limiting instruction as to be applicable to certain issues in the case.

Since the defendant District of Columbia in the constitutional claim and the defendant Chief of Police Maurice T. Turner, on the constitutional claims against him are no longer before you by action of this court, certain of the evidence that was admitted that pertains to their claims against them should not be considered by you in your deliberations in reaching a verdict.

Tr. 1475–76. In our opinion, this vague instruction did little, if anything, to mitigate the effects of the errors.

Though we conclude that the district court committed reversible error, we note our recognition that "allegation" or "other complaints" evidence against the city would have been in order in this case if the district court had properly circumscribed and controlled such evidence to protect against jury misuse. Our concern is not with the endeavor to show that the episode in suit indicated an official policy or custom; it is with the unrestrained manner in which plaintiffs were allowed to proceed. We recognize that the § 1983 case against the District that plaintiffs stated and attempted to prove required a showing that the municipality was both on notice of and indifferent to widespread police brutality. Evidence of excessive force claims in numbers was indeed relevant to that case. *See Fiacco, supra,* 783 F.2d at 328.

C. *The Fourth Amendment Damage Awards*

As earlier recounted, the jury awarded plaintiffs $40,000 each on their fourth amendment claims against the individual police officers; on the common law false arrest claims, the award was $10,000 for Carter and $5,000 for Parker. On post-trial reflection (prompted by defendants' motion for judgment notwithstanding the verdict, a new trial, or a remittitur), the district judge determined that the fourth amendment and false arrest awards were duplicative, *i.e.,* they compensated plaintiffs twice for the same tortious conduct—the arrest and imprisonment of plaintiffs Carter and Parker.[10]

---

10. The contention that the special verdict form allowed the jury to award damages twice for the same tortious activity was raised for the first time in defendants' post-verdict motion. The district judge explained that he had not combined the fourth amendment and false arrest claims on the verdict form because the city's *respondeat superior* liability extended only to the common law tort. Mem.Op. at 5. Plaintiffs suggest an additional reason for the separation: their entitlement to counsel fees, if they prevailed, would attach only to the constitutional claims. Reply Brief for Appellants Charles Carter and Aleta Parker at 64. We leave it to the

The judge further recognized, on his own initiative, that he had charged the jury incorrectly on the damages awardable for fourth amendment infractions. Without objection from the defense, he had instructed: "Constitutional rights are of themselves valuable, and you may compensate the plaintiffs for the loss of their rights as such." Tr. 1464. Our precedent, however, limited recovery for the violation of constitutional rights to actual losses suffered (e.g., bodily injury, mental anguish, loss of earnings) or, in the absence thereof, nominal damages. *Hobson v. Wilson*, 737 F.2d 1, 59–60 (D.C.Cir.1984), *cert. denied,* ── U.S. ──, 105 S.Ct. 1843, 85 L.Ed.2d 142 (1985); *Doe v. District of Columbia,* 697 F.2d 1115, 1122–25 (D.C.Cir.1983). Citing *Hobson,* the Supreme Court has just affirmed that damages based on the abstract "value" or "importance" of constitutional rights are not authorized by § 1983. *Memphis Community School District v. Stachura,* ── U.S. ──, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986). To cure the mistake in his charge and eliminate the double recovery, the district judge deleted the $40,000 fourth amendment awards in their entirety. Mem.Op. at 4–6.[11] He did not seek plaintiffs' consent to the cutback; indeed he ordered it over plaintiffs' objection. This was improper remittitur procedure.

On remand, the issue we address here should not recur. The district judge will no doubt cure the error in his charge and submit to the jury a verdict form that does not invite duplicative awards. Nonetheless, we think it an appropriate precaution to explain why it was improper for the district judge, without plaintiffs' consent, simply to lop off the $40,000 awards.

■ Except when "it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there," a trial judge should not unconditionally reduce the amount of damages awarded by verdict, for to do so impermis-

sibly encroaches upon the litigants' constitutional right to a jury. *See* 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2815, at 99 (1973). The district judge in this case considered the $40,000 amounts awarded on the plaintiffs' fourth amendment claims to be "readily identifiable" sums attributable entirely to the error in his charge. Mem.Op. at 6 n. 3. We think the extent to which the charge error affected the jury's damage assessments is not so readily pinpointed.

If a trial court, employing a special verdict, erroneously allows the jury to render an award for punitive damages, for example, that segregated, precisely stated award would be readily identifiable as relating to a wholly discrete issue of law, and the special verdict could be rectified by the court without further jury proceedings. *See Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 256 n. 12, 101 S.Ct. 2748, 2754 n. 12, 69 L.Ed.2d 616 (1981); *see also Scottish Union & National Ins. Co. v. Bejcy,* 201 F.2d 163, 166 (6th Cir.1953). Other examples of readily identifiable sums incorporated in a verdict that "should not have been there" include interest, *see New York, L.E. & W. R.R. v. Estill,* 147 U.S. 591, 619–22, 13 S.Ct. 444, 455–56, 37 L.Ed. 292 (1893), and the amount that should have been subtracted under an insurance policy's apportionment clause, *see Westchester Fire Ins. Co. v. Hanley,* 284 F.2d 409, 418 (6th Cir. 1960) (applying insurance policy's apportionment clause to reduce plaintiffs' recovery to 75% of total damages jury determined plaintiffs had suffered). *See also Crossman v. Fountainbleau Hotel Corp.,* 346 F.2d 152, 153 (5th Cir.1965) (judgment reduced by witness travel expenses and fees for which there was no entitlement under the applicable law).

■ Here, however, one could not say with certainty that the $40,000 figures recorded as damages under the heading "fourth amendment," reflected simply and

---

district court and the parties on remand to devise a verdict form that will not invite the jury to compensate plaintiffs more than once for the same losses.

11. The trial judge did not rule, nor do the circumstances of this case indicate, that the total amounts of the damage awards were larger than the evidence justified.

only price tags the jury placed on "the loss of constitutional rights as such." The charge informed the jury that plaintiffs could recover for bodily injury, mental suffering, and wage losses under the fourth amendment heading. Tr. 1464. Conceivably, the jurors here totalled the amounts they found for these items of actual damage, and then allocated the total between the false arrest and fourth amendment counts. Perhaps they had in mind, in settling on the respective verdicts, limiting the sums for which the District would be answerable directly, based on a notion that the city itself was not blameworthy. Such a judgment, although not consonant with *respondeat superior* doctrine, is the kind of response jurors not altogether uncommonly make. *Cf.* 9 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2503, at 489 (1971) (noting argument that "one of the purposes of the jury system is to permit the jury to temper strict rules of law by the demands and necessities of substantial justice"). Reviewing the record at this distance from the trial, with no opportunity to poll the jury, all one could say with security is this: How much, if anything, the jurors awarded "for the per se violation of Constitutional rights," Mem.Op. at 6 n. 3, is speculative, destined to remain unknown and unknowable, given the summary, opaque nature of the special verdict form.[12]

Unless a jury's assessment of damages includes an impermissible component that can be identified and calculated with precision—and as we have just explained, the fourth amendment awards here are not of that character—it is not the district court's prerogative to enter a remittitur by fiat. Instead, the appropriate procedure is to pose to plaintiffs the choice between consent to the reduction and a new trial. *See, e.g., Brewer v. Uniroyal, Inc.,* 498 F.2d 973, 976 (6th Cir.1974).[13] Only by so proceeding can a district judge avoid encroaching on the parties' jury trial right.

■ In sum, a trial judge may enter judgment on a jury's verdict despite a charge error that may bear on the size of the verdict, if the adverse party does not timely object to the charge error. *See* Fed. R.Civ.P. 51. The judge may reduce the damage award if the verdict winner consents to the reduction, or the judge may order a new trial on his own initiative. *See* Fed.R.Civ.P. 59(d) (new trial may be ordered, on initiative of the court, "for any reason for which [court] might have granted a new trial on motion of a party"). But the judge may not decree a verdict excision—except for a plainly identifiable sum certain incorrectly included in the verdict—absent the plaintiff's informed consent.

### D. *Plaintiffs' Entitlement to Declaratory Relief*

■ Plaintiffs requested as equitable relief both expungement of their arrest records and a declaration that their seizure and incarceration on March 22, 1982, shall be deemed, for all purposes, detentions rather than arrests. The district court en-

---

**12.** The fifth and sixth amendment awards in this case were similarly impenetrable. The trial judge delivered one general instruction covering simultaneously all three constitutional claims. That instruction was flawed because it authorized the jury to set plaintiffs' recovery at amounts above physical, psychological, and economic injury. *See* Tr. 1464. The judge refused to reduce the fifth and sixth amendment awards because defendants had failed to object to the general constitutional damage instruction at the time the charge was given. Mem.Op. at 6–7 n. 3. The judge correctly invoked Rule 51 of the Federal Rules of Civil Procedure, which provides: "No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consid-

er its verdict, stating distinctly the matter to which he objects and the grounds of his objection." The Rule 51 rationale, it appears to us, could have shielded the fourth amendment awards to the same extent that it insulated the fifth and sixth amendment awards. *See supra* note 10 (objection to fourth amendment awards first raised by post-verdict motion).

**13.** Because the seventh amendment right to jury trial pervades the atmosphere, it is appropriate to set a remittitur so as to permit recovery of the highest amount the jury tolerably could have awarded. *Cf.* 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2815, at 104–105 (1973).

tered a sealing order, but did not provide for declaratory relief. On appeal, plaintiffs press their request for declaratory relief. They urge the difficulty to which they are currently exposed when confronted with applications inquiring whether they have ever been "arrested." Our case law supports coupling an expungement or sealing order with such declaratory relief in analogous situations. *See Tatum v. Morton,* 562 F.2d 1279, 1285 n. 17 (D.C.Cir.1977). At this juncture, of course, relief concerning the arrest records is contingent upon the outcome of the new trial our judgment requires.

In response to this court's inquiry, made by order dated April 9, 1986, the District stated, in an April 18 submission, that it opposes relief in the form of a declaration that the seizure of plaintiffs herein shall be deemed detentions rather than arrests. At most, the District urges, plaintiffs might be entitled to a declaration that "the arrests here were made without probable cause." Response to Order, filed April 18, 1986. Prior to such a declaration, however, the District contends, "the trial court should satisfy itself independently of the jury that there was no probable cause for the arrest[s]." *Id.* at 3. As authority, the District cites local precedent, pursuant to which decisions concerning the sealing of arrest records are entrusted to trial judges, applying a "clear and convincing evidence" standard, and are subject to appellate reversal, absent "an error of law," only if "plainly wrong or unsupported by evidence." *See Earle v. District of Columbia,* 479 A.2d 877, 879–80 (D.C.1984).

The trial judge in this case, however, had already ordered, without objection on the part of the District, that plaintiffs' arrest records be sealed. Indeed, in its initial brief on appeal, the District recognized that the district court had in fact found "that the plaintiffs were arrested on March 22, 1982 without probable cause." Brief for Appellees/Cross-Appellants at 58. Therefore, the issue tendered in the parties' briefs is not the one presented in *Earle,* *i.e.,* whether sealing denied by the trial court should be ordered on appeal; instead, the question posed here is whether a district court's finding of no probable cause for plaintiffs' arrest and resultant sealing order should be complemented by declaratory relief.[14]

We discern no cogent reason, should plaintiffs prevail at trial, for refusing to relieve them of the stigma of responding "Yes" to the question, "Ever arrested?"[15] Accordingly, we instruct the district court, in the event that plaintiffs prevail on remand, to direct, by declaratory order, that: 1) plaintiffs Charles Carter and Aleta Parker may disregard the episode in suit in answering any inquiry regarding whether he or she has ever been arrested, *see Natwig v. Webster,* 562 F.Supp. 225, 227, 232 (D.R.I.1983); and 2) the seizure and incarceration of plaintiffs at issue shall be deemed, for all purposes, "detentions" rather than "arrests." *See Tatum, supra.* With that declaratory relief, neither plaintiff would ever have to report the March 22, 1982, incident as an arrest "on an application for employment or for admission into an educational program, or on any similar form requesting biographical data." *See* Brief of Appellants Charles Carter and Aleta Parker at 71–72.

**14.** The District argues that the sealing order, as imposed by the district court, is interim, not final, relief, and is therefore not ripe for review. But if the district court did not, by its judgment, finally adjudicate, and disassociate itself from, this case, there would be a serious question whether the judgment had the finality prerequisite to our appellate review. *See* Fed.R.Civ.P. 54(b) (order adjudicating fewer than all claims remains interlocutory absent express direction for entry of final judgment as to the claims that have been fully adjudicated).

**15.** The District would require plaintiffs to plead, "Yes, with an explanation," *i.e.,* "the arrests were made without probable cause." Response to Order, filed April 18, 1986, at 2. We think the plaintiffs (again, if they prevail on remand) are entitled to demand a surer safeguard. Nor do we count it sufficiently comforting for plaintiffs to note, as the District does, *id.* at 3, that "for an employer to refuse to hire because of an arrest record has been held to violate federal law. *See Gregory v. Litton Systems, Inc.,* 472 F.2d 631 (9th Cir.1972)."

## E. *Vanderbloemen's Default*

■ As we have already observed, Vanderbloemen, one of the individual police officer defendants involved in the events in suit, defaulted. *See* Fed.R.Civ.P. 55(a). In his charge, the trial judge informed the jurors that, because of Vanderbloemen's default, they were to determine damages with respect to him even if they found the two other individual defendants, officers Markovich and Tarantella, not liable. *See* Fed.R.Civ.P. 55(b)(2). The judge further instructed the jurors that, because the city had conceded that all three officers were acting within the scope of their employment at the time of the March 22, 1982, incident, the District of Columbia would therefore be liable for the damages assessed against Markovich, Tarantella and/or Vanderbloemen on the common law claims. Tr. 1463, 1471–73. Defendants renew on appeal their contention before the district court that the jury should have received no instruction at all on Vanderbloemen's default; the information imparted in the charge, according to defendants, conflicted with redoubtable Supreme Court precedent, *Frow v. De La Vega*, 82 U.S. (15 Wall.) 552, 21 L.Ed. 60 (1872), and was "devastatingly prejudicial." Brief for Appellees/Cross-Appellants at 68. The district court appropriately disposed of these objections.

First, the *Frow* decision is inapposite. Plaintiffs De La Vega in that case alleged a joint conspiracy by several defendants to deprive him of a large tract of land; he sued in equity to regain clear title to the property. One of the defendants, Frow, failed to answer on time. He was denied leave to file late and a default decree was entered against him adjudging that plaintiff De La Vega held good title to the property. The remaining defendants had answered on time. They denied fraud, prevailed at trial, and obtained an order dismissing De La Vega's complaint. The lower court's successive dispositions thus stood in irreconcilable conflict. According to the default declaration, De La Vega had title; according to the adjudication at trial, the claimants adverse to De La Vega did. In those circumstances, the Supreme Court said, any result other than dismissal of the complaint as to all defendants, including the defaulter, would be absurd. *Id.* at 554.

Defendants here have extracted language from *Frow* and placed it wholly outside the domain of that land title dispute. *Frow* was about "inconsistent adjudications as to joint liability or as to a single res in controversy," and "remains good law" in that setting. *In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1257–58 & n. 40 (7th Cir.1980). But the venerable *Frow* case should not be extended "to a context for which it was never intended." *Id.* at 1257. The holding in *Frow* did not "rest solely on the fact that the liability alleged was joint";[16] more importantly, *Frow* responded to the reality that "[u]nder plaintiff's demand for relief, it was necessary that judgment be entered against all of the defendants in order to be effective." *See* 6 J. MOORE, MOORE'S FEDERAL PRACTICE ¶ 55.-06, at 55–38 to 55–39 (2d ed. 1985) ("*Frow* stands for the narrow rule that a default judgment may not be entered against one of several defendants (1) where the theory of recovery is one of true joint liability, such that, as a matter of law, no one defendant may be liable unless all defendants are liable, or (2) where the nature of the relief demanded is such that, in order to be effective, it must be granted against each and every defendant.").

Defendant Frow, despite his default, eventually shared the success his co-defendants achieved, since the full adjudication, which concluded with dismissal of the complaint, could not be reconciled with the earlier declaration that plaintiff De La Vega held good title to the single tract of

---

16. *But see* 10 C. WRIGHT, A. MILLER & N. KANE, FEDERAL PRACTICE AND PROCEDURE § 2690, at 458 (1983) (stating without elaborative discussion that the rule in *Frow* applies "when the liability is joint and several" and extends beyond that "to situations in which several defendants have closely related defenses").

land in controversy.[17] Here, by contrast, Vanderbloemen's situation was severable from Markovich's and Tarantella's. As the district judge correctly instructed the jury:

[W]here there is more than one defendant involved in a particular claim, it does not follow that if one is liable all the others in that claim are also liable.

Each defendant is entitled to a fair consideration of his own defense and is not to be prejudiced by the fact ... that you may find against the other defendant or defendants.... If you should find that only one defendant is liable, then your verdict should be in favor of the plaintiff against that defendant alone.

Tr. at 1450–51.

Nor did the trial judge restrict the District in its introduction of evidence regarding Vanderbloemen's actions. The city endeavored, constantly, at length, and without court constraint, both in the course of trial and in its summation, to persuade the jury that the conduct of all three officers, individually and jointly, was appropriate under the circumstances. Mem.Op. at 12. It was open to the jury, as the district court pointed out, id., and will be open to the jury on remand, to hold for defendants Marokovich and Tarantella, and to award only nominal damages against Vanderbloemen.

We note, finally, that prejudice might have worked against plaintiffs had the trial judge followed the counsel of the defense to say nothing of the default. Vanderbloemen figured conspicuously in the March 22, 1982, incident. The jury would have been left to engage in unguided speculation had it been sent off to deliberate without information about Vanderbloemen's absence. In sum, we find no reversible error in the district court's treatment of officer Vanderbloemen's default.

### F. Plaintiffs' Closing Argument

Prior to counsels' summations, punitive damage claims had been excised from the case. See Tr. 1344–45. In the course of his closing argument, plaintiffs' counsel three times asked the jury to "send a message" that the police conduct at issue will not be tolerated. Defendants contend that plaintiffs' "send a message" pleas were out of order once the parties understood that the damages at issue were solely compensatory. They unsuccessfully moved in the district court for a mistrial, and now ask us to order a new trial, on the ground that the "send a message" statements effectively invited a punishing verdict.

Both sides, review of the record reveals, pressed overheated closing argument upon the jury. The trial judge allowed counsel considerable leeway, but he ultimately reminded the jury to base its verdict on the evidence, not on counsels' remarks. See Tr. 1442–45. While we do not say that we would order a new trial if closing argument here were the only ground,[18] we anticipate

---

17. In addition to the differences in subject matter (land title in *Frow*, personal injuries here), and, correspondingly, in the character of the liability sought to be imposed (joint in *Frow*, joint and several here), the litigation events are not comparable. In *Frow*, a loss by a first defendant was followed by a victory at trial for all remaining defendants. Here, Vanderbloemen's default was followed by a loss at trial for defendants Markovich and Tarantella. Had the remaining defendants lost in *Frow*, the defaulter would not have escaped his initial fate.

18. Defendants, we note, did not avail themselves of the opportunity to propose, as an alternative to a mistrial declaration, a specific curative instruction. See Tr. 1387–88; cf. *Emery-Waterhouse Co. v. R.I. Hospital Trust National Bank*, 757 F.2d 399, 410 (1st Cir.1985) ("If [defend-

ant's] claim here is that the district court should have given a cautionary instruction, the conclusive answer to that claim is that [defendants] failed to ask for one."). Moreover, compensatory damages in cases such as this one indeed are intended to serve a deterrent function, see *Owen v. City of Independence*, 445 U.S. 622, 651 (1980); *Doe v. District of Columbia*, 697 F.2d 1115, 1124 (D.C.Cir.1983), and plaintiffs' summation next time around may legitimately point that out. Finally, we observe that defendants feature snippets from cases with scant resemblance to this one save for the telling point that in each, an appellate court *sustained* the trial court's disposition. See *Emery-Waterhouse Co. v. R.I. Hospital Trust National Bank, supra; Dixon v. International Harvester Co.*, 754 F.2d 573 (5th Cir.1985); *United States v. Cheung Kin Ping*, 555 F.2d 1069 (2d Cir.1977). One cannot

that on remand the judge will hold counsel for both sides to a tighter rein.

### G. *The Emotional Distress Claim*

 Defendants fault the district judge for failing to direct a verdict in favor of officers Markovich and Tarantella on the charge that they intentionally inflicted emotional distress on plaintiffs Carter and Parker. Both plaintiffs testified to multiple indignities heaped upon them by all three officers on March 22, 1982. Furthermore, construing the evidence favorably to plaintiffs as a judge must in ruling on a directed verdict motion by the defense, *see Alden v. Providence Hospital,* 382 F.2d 163, 165 (D.C.Cir.1967), one could readily conclude that all three officers, in the full and cool light of day, deliberately uttered false reports of criminal activity on Carter's and Parker's part.

Plaintiffs are entitled to the judgment of a jury on the quality of the officers' conduct. And a reasonable jury, crediting plaintiffs' account of the episode in suit, could well find that officers Markovich and Tarantella, in arresting and thereafter filing charges against Carter and Parker, acted egregiously, intentionally, or recklessly to cause plaintiffs severe emotional distress. *See Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37 (D.C.1982); *see also* RESTATEMENT (SECOND) OF TORTS § 46 comment e (1965) (outrageous conduct may consist of abuse of position of authority, particularly by, *inter alia,* police officers). The argument that, as a matter of law, Markovich and Tarantella should have been exonerated on the intentional infliction of emotional distress charge is rootless. ·

### CONCLUSION

For the reasons stated, the directed verdict for the District of Columbia on the constitutional tort claim is affirmed, the judgments entered pursuant to the jury's verdict are vacated, and the case is remanded for a new trial of the constitutional and common law tort claims against officers Markovich, Tarantella, and Vanderbloemen,

and, as to the common law claims, the *respondeat superior* liability of the District.

*It is so ordered.*

reliably predict from such affirmations whether the appeals court would reverse a trial court's

disposition in a significantly different case and setting.