Betty BLAIR, et al., Plaintiffs,

v.

CITY OF CLEVELAND,
et al., Defendants.

No. 1:94 CV 2626.

United States District Court,
N.D. Ohio,
Eastern Division.

Aug. 29, 2000.

John W. Martin, Law Offices of John W. Martin, Cleveland, OH, William D. Beyer, Sr., Joan E. Pettinelli, Wuliger, Fadel & Beyer, Cleveland, OH, Ernest L. Jarrett, Detroit, MI, for Plaintiff.

Kathleen A. Martin, Thomas J. Kaiser, Heather D. Graham-Oliver, Matthew T. Brady, City of Cleveland Dept. of Law, Cleveland, OH, for Defendant.

Shawn M. Mallamad, Law Offices of Jay S. Hanson, Cleveland, OH, Nick Tomino, Medina, OH, for Defendant.

## ORDER

OLIVER, District Judge.

Currently pending before the court are the Motion for Summary Judgment of Defendants Michael Tankersley and Jeffrey Gibson (Doc. No. 182), the Motion for Summary Judgment of Defendants City of Cleveland, Mayor Michael White, Carolyn Allen and Edward Kovacic (Doc. No. 183), Plaintiffs' Motion to Strike Exhibit D to Defendants City of Cleveland, Mayor Mi-chael White, Carolyn Allen and Edward Kovacic's Motion for Summary Judgment (Doc. No. 186) and Defendants' Motion to Quash Partial Deposition Testimony of Plaintiffs' Expert Witness and for Protective Order (Doc. No. 192). For the reasons stated below, the Motion for Summary Judgment of Defendants Michael Tankersley and Jeffrey Gibson (Doc. No. 182) is granted in part and denied in part, the Motion for Summary Judgment of Defendants City of Cleveland, Mayor Michael. White, Carolyn Allen and Edward Kovacic (Doc. No. 183) is granted in part and denied in part, Plaintiffs' Motion to Strike Exhibit D to Defendants City of Cleveland, Mayor Michael White, Carolyn Allen and Edward Kovacic's Motion for Summary Judgment (Doc. No. 186) is granted, and Defendants' Motion to Quash Partial Deposition Testimony of Plaintiffs' Expert Witness and for Protective Order (Doc. No. 192) has been withdrawn in part and granted in part.

## I. FACTS

Plaintiffs Betty Blair, Jack Blair, Brittany Calhoun, Brandy Calhoun, Michael Calhoun, Larry Pipkins, Jack Pipkins, Jacqueline Pipkins and Gerald Pipkins (collectively, "Plaintiffs") filed the instant action against the City of Cleveland, the City of Cleveland Police Department, Michael R. White, Carolyn W. Allen, Edward P. Kovacic, Michael Tankersley and Jeffrey Gibson (collectively, "Defendants"), alleging, *inter alia*, constitutional violations pursuant to 42 U.S.C. § 1983. Plaintiffs' suit stems from the death of Michael Pipkins ("Pipkins"), who having been arrested on suspicion of automobile theft, died allegedly as a result of the use of excessive force by City of Cleveland police officers Michael Tankersley ("Officer Tankersley") and Jeffrey Gibson ("Officer Gibson"), while in their custody, on

December 28, 1992. While many of the events preceding Pipkins' death are in dispute, the key factual issues can be summarized as follows.

On the evening of December 28, 1992, Officers Tankersley and Gibson were on duty in Cleveland's Fourth District. As the officers approached a parking lot at the corner of E. 131st Street and Ferris Avenue, they observed a parked automobile. Officer Tankersley allegedly recognized that the automobile fit the description of a vehicle which recently had been reported stolen, and asked Officer Gibson to contact the police radio dispatcher. As the officers approached the vehicle to obtain the license plate number, one of the vehicle's occupants got out of the car and left the area, while one occupant remained in the back seat. Officer Tankersley indicates he was able to view the person leaving the vehicle. Once the officers had received radio confirmation that the vehicle was indeed stolen, they then placed the remaining occupant, Rubin Smith, under arrest.

Having arrested Rubin Smith, the officers sought his assistance in locating the second occupant of the stolen vehicle, and began touring the area. As their patrol car approached the corner of E. 136th Street and Ferris Avenue, the officers sighted a man, later identified as Michael Pipkins, who they allegedly recognized as the second occupant of the stolen vehicle. The man was drinking from a bottle, the contents of which he began to pour out. Officer Tankersley approached Pipkins on foot, and informed him that he was under arrest. It is undisputed that Pipkins then attempted to flee, and a struggle ensued.

According to the officers, Officer Gibson grabbed Pipkins around the mid-section and wrapped his leg around Pipkins' legs in an attempt to trip him. Both men fell, Pipkins landing on top of Officer Gibson.

Officer Tankersley pulled Pipkins off of Officer Gibson, then pushed him to the ground, face down with his arms under his chest. Both officers were on top of Pipkins as they attempted to pull his arms out and handcuff them behind his back.

At this point, Plaintiffs allege that Officer Tankersley applied a "choke hold" to Pipkins, placing his arm around Pipkins' neck and applying pressure, thereby rendering him unconscious. The officers, on the other hand, maintain that when Pipkins raised his head in an attempt to bite Officer Tankersley, the officer simply placed his forearm along the side of Pipkins' neck in order to hold his head down. Eventually, the officers successfully handcuffed Pipkins.

According to Plaintiffs, Pipkins was limp and motionless when the officers carried him to their patrol car and "threw" him into the back seat, where he landed face down with his head in Rubin Smith's lap. After driving a short distance, the officers stopped and removed Rubin Smith from the back seat, purportedly out of concern for Smith's safety. They proceeded to the Fourth District police station, with Pipkins still lying face down in the back seat.

The parties dispute whether Pipkins was conscious when he arrived at the police station. Plaintiffs assert that the officers dragged Pipkins into a cell and dropped him on the floor, where he lay unconscious, made no sounds, and did not appear to be breathing, for nearly fifteen minutes before officers eventually summoned emergency medical personnel. *See* Affidavit of Josetta Coleman. The officers, on the other hand, assert that after they pulled Pipkins out of the car, they took hold of him under his arms and began to walk into the station. After a few steps Pipkins body became heavier and he slouched to the ground, whereupon the officers immediately called out for assistance. Pipkins was

transported to St. Luke's hospital where he was pronounced dead.

Plaintiffs, Pipkins' surviving next of kin, filed the instant action on December 20, 1994. Through the course of their briefing, Plaintiffs have indicated that they agree that all claims against Defendants White, Allen and Kovacic should be dismissed. Plaintiffs' Combined Brief in Opposition to Defendants' Motions for Summary Judgment at 23. Accordingly, the instant action is hereby dismissed with prejudice with regard to those defendants. In addition, Plaintiffs have voluntarily limited the scope of several of their claims. *Id.* at 22, 24, 37. Thus, Plaintiffs' claims as they now stand can be summarized as follows.

Count One, against Officers Tankersley and Gibson, alleges unlawful arrest in violation of Pipkins' Fourth Amendment rights. Count Two, against all Defendants, alleges excessive force during the course of the arrest, in violation of Pipkins' Fourth Amendment rights. Count Three, against all Defendants, alleges deliberate indifference to Pipkins' serious medical needs, in violation of his Eighth and Fourteenth Amendment rights. The first three counts of Plaintiffs' Complaint are brought pursuant to 42 U.S.C. § 1983. Count Four, against Officers Tankersley and Gibson, alleges conspiracy to interfere with civil rights pursuant to 42 U.S.C. § 1985(3). Counts Five and Six, against Officers Tankersley and Gibson, are wrongful death and survival claims filed pursuant to Ohio Rev.Code. §§ 2125.02 and 2305.21. Plaintiffs concede that their claim for punitive damages may not be pursued against the City of Cleveland, *id.* at 22, and therefore pursue punitive damages only against Officers Tankersley and Gibson in their individual capacities.

Defendants have filed motions for summary judgment regarding all of Plaintiffs' claims. As grounds for their motions, Defendants assert that there are no genuine issues of material fact, and that judgment should be rendered in their favor on the merits as a matter of law. Alternatively, Defendants argue that even assuming they violated Pipkins' rights, they are entitled to summary judgment on the ground of qualified immunity with regard to each of Plaintiffs' federal claims, and on the ground of statutory immunity with regard to Plaintiffs' state claims.

## II. *PENDING MOTIONS*

As an initial matter, the court addresses Plaintiffs' Motion to Strike Exhibit D to Defendants City of Cleveland, Mayor Michael White, Carolyn Allen and Edward Kovacic's Motion for Summary Judgment (Doc. No. 186). Plaintiffs seek the exclusion of an article entitled "Emergency Management of Acute Phencyclidine [PCP] Intoxication," on the grounds that the article was not presented in conjunction with any medical expert testimony, and has not been properly authenticated. Defendants have not opposed Plaintiffs' motion. Plaintiffs' motion is granted for the reasons advanced therein.

Plaintiffs also have filed a Motion to Quash Partial Deposition Testimony of Plaintiffs' Expert Witness and for Protective Order (Doc. No. 192). Both issues addressed in Plaintiffs' motion involve the deposition of Plaintiffs' expert witness, Dr. Donald T. Reay, which was scheduled to take place via teleconference video link-up on May 10, 2000. After discussion during the final pretrial of this matter, Plaintiffs have withdrawn their motion to quash Dr. Reay's deposition.

Plaintiffs also seek a protective order, prohibiting counsel for Defendants from having any further direct contact with Dr. Reay. Counsel for Defendants contacted Dr. Reay, purportedly for the purpose of

scheduling his deposition. The parties dispute whether the conversation which took place between counsel and Dr. Reay revolved entirely around the logistics of Dr. Reay's deposition, or included substantive matters which would have been inappropriate topics of discussion in the absence of counsel for Plaintiffs.

Whatever the purpose and content of past telephone conversations, Defendants have indicated that they will have no further need to contact Dr. Reay. Accordingly, the court orders that any future communications regarding the deposition of Dr. Reay be made through, or in the presence of, counsel for Plaintiffs.

## III. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) governs summary judgment motions and provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law . . . .

Rule 56(e) specifies the materials properly submitted in connection with a motion for summary judgment:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein . . . . The court may permit affidavits to be supplemented or opposed by depositions, answers to interrogatories, or further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allega-

tions or denial of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

However, the movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In reviewing summary judgment motions, this court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *White v. Turfway Park Racing Ass'n, Inc.,* 909 F.2d 941, 943–44 (6th Cir.1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252, 106 S.Ct. at 2512.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex,*

477 U.S. at 322, 106 S.Ct. at 2552. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989) (citing *Frito–Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C.Cir.1988)). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. City of Columbus*, 801 F.Supp. 1, 4 (S.D.Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id.*

## IV. FEDERAL CLAIMS

### A. LEGAL STANDARDS

#### 1. Claims Against Individual Officers

#### a. Violation of Constitutional Rights

In analyzing Plaintiffs' constitutional claims, this court must begin by determining whether the plaintiff has presented facts which, if proven, demonstrate that the officers violated a constitutional right. *Monday v. Oullette*, 118 F.3d 1099, 1102 (6th Cir.1997). At this stage, the court is essentially examining Plaintiffs' claims on the merits. If the court determines that, viewing the facts in the light most favorable to Plaintiffs, the officers did not violate Pipkins' constitutional rights, then the analysis ends, and Defendants are entitled to summary judgment.

#### b. Qualified Immunity

If Plaintiffs can present evidence which would support a jury's finding that a constitutional violation took place, the court must then determine whether Offi-

cers Tankersley and Gibson are entitled to qualified immunity. In *Harlow v. Fitzgerald*, the seminal case on qualified immunity for government officials, the Supreme Court announced that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Government officials such as police officers are protected by qualified immunity "as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

Assuming the court finds that the officers violated a constitutional right, the court must then decide whether the right allegedly violated was a "clearly established constitutional right[ ] of which a reasonable person would have known." *Monday*, 118 F.3d at 1102. "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. In order to determine whether a right was clearly established at the time of the alleged offense, the court looks for binding Supreme Court and Sixth Circuit precedent. *Cullinan v. Abramson*, 128 F.3d 301, 311 (6th Cir. 1997). Under certain circumstances, a court may also look to decisions of the highest court in the state in which the action arose, or to its own decisions. *Wegener v. City of Covington*, 933 F.2d 390, 392 (6th Cir.1991).

■ In making its determination, the court must characterize the right with sufficient particularity to determine whether a reasonable person could have known that his or her action was in violation of the plaintiff's constitutional rights:

The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Id.* at 640, 107 S.Ct. at 3039.

■■ Upon a finding that a clearly established right was violated, the court must then determine whether the officers' actions were "objectively unreasonable in the light of the clearly established constitutional rights." *Dickerson v. McClellan,* 101 F.3d 1151, 1158 (6th Cir.1996). The test which *Harlow* teaches this court to apply is an objective one. In the case *sub judice,* the court must decide whether a hypothetical police officer, standing in the defendants' shoes, would necessarily have understood that the actions taken by the defendant would violate Pipkins' clearly established constitutional rights.

■ Defendants asserting qualified immunity bear the initial burden of presenting facts which indicate that they were acting within the scope of their discretionary authority at the time of the alleged violation, *Wegener,* 933 F.2d at 392, an issue which the parties do not dispute in the instant case. The burden then shifts to Plaintiffs to show conduct that violated a clearly established right. *Id.* Plaintiffs bear the ultimate burden of proving that the defendants are not entitled to qualified immunity. *Id.*

### 2. *Claims Against Municipality*

■ Municipal liability is governed by a separate standard, and municipalities may not assert qualified immunity as a defense to liability. *Owen v. City of Independence,* 445 U.S. 622, 638, 100 S.Ct. 1398, 1409, 63 L.Ed.2d 673 (1980). A municipality such as the City of Cleveland is considered a "person" for the purposes of § 1983 actions, and can be sued directly for constitutional violations which it has itself caused, pursuant to official municipal policy. *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035, 56 L.Ed.2d 611 (1978). However, a city may not be held liable on a respondeat superior or vicarious liability theory for the independent actions of its employees. *Id.* at 691, 98 S.Ct. at 2036. Rather, only where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" may a city be subject to liability under § 1983. *Id.* at 694, 98 S.Ct. at 2037–38.

■ A city's failure to train, supervise or discipline its employees adequately may be considered a custom or policy where such failure amounts to deliberate indifference to the rights of the city's inhabitants:

[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*City of Canton v. Harris,* 489 U.S. 378, 390, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). However, a plaintiff asserting municipal liability based upon an alleged failure to train, supervise or discipline must demonstrate both culpability on the part of the municipality, and a causal link between the municipal action and the deprivation of rights. *Board of County Comm'rs of Bryan County v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 1388, 137 L.Ed.2d 626 (1997).

 Therefore, assuming Plaintiffs can establish that Officers Tankersley and Gibson committed a constitutional violation, this court requires Plaintiffs to show three things in order to hold the City of Cleveland liable for the officers' transgressions. First, Plaintiffs must prove that the training given to the City of Cleveland's police officers was, in fact, inadequate. Second, Plaintiffs must establish culpability by proving that it was the City's conscious decision, when faced with an obvious need, to not provide adequate training. Finally, to establish causation, Plaintiffs must prove that the City's failure to provide adequate training was the "moving force" behind the constitutional violation. *Sova v. City of Mt. Pleasant,* 142 F.3d 898, 904 (1998) (citing *Monell,* 436 U.S. at 694, 98 S.Ct. at 2038).

## B. ANALYSIS OF FEDERAL CLAIMS

### 1. *Unlawful Arrest*

#### a. Constitutional Violation

Plaintiffs allege in Count One of the Complaint that Officers Tankersley and Gibson unlawfully arrested Pipkins, in violation of his Fourth Amendment rights. The court first examines whether the evidence presented by Plaintiffs adequately supports a claim of unlawful arrest.

 It is undisputed that Officers Tankersley and Gibson did not have a warrant to arrest Pipkins. In order to comply with the requirements of the Fourth Amendment in the absence of a warrant for his arrest, the officers must have had probable cause to believe that Pipkins had violated, or was violating, the law. *United States v. Strickland,* 144 F.3d 412, 415 (6th Cir.1998) (citing *Criss v. City of Kent,* 867 F.2d 259, 262 (6th Cir.1988)). Probable cause consists of "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Criss,* 867 F.2d at 262 (citing *DeFillippo,* 443 U.S. at 37, 99 S.Ct. at 2632). Even where officers mistakenly believe there is probable cause to arrest, their determination is not actionable as long as it was reasonable. The reasonableness of an officer's probable cause determination is a question of law to be decided by the trial judge. *Jeffers v. Heavrin,* 10 F.3d 380, 381 (6th Cir.1993) (citing *Hunter v. Bryant,* 502 U.S. 224, 112 S.Ct. 534, 116 L.Ed.2d 589).

 This court must determine whether the officers, knowing what they knew at the time of the arrest, were justified in their belief that Pipkins had committed a crime. Whether or not Pipkins was actually guilty does not factor into the court's analysis. *Criss,* 867 F.2d at 262 (citations omitted). Nor are the officers' motives, good or bad, relevant to the probable cause determination. *Id.* The court's determination is not based on a precise formula, but rather is based upon the "factual and practical considerations of every day life that would lead a reasonable person to determine that there is a reasonable probability that illegality has occurred...." *Strickland,* 144 F.3d at 415

(citing *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983)).

 Officers Tankersley and Gibson assert that their probable cause determination was based upon their having recognized Pipkins as one of the occupants of a stolen vehicle. According to the officers, Officer Tankersley remembered seeing the vehicle on a list of recently stolen automobiles. This caused him to request that Officer Gibson radio in the vehicle's license plate number. Whether or not Officer Tankersley did, in fact, recognize the vehicle is immaterial, since the radio dispatcher eventually confirmed that the vehicle was, indeed, stolen. At that point, based upon the information available to them, the officers had probable cause to arrest the occupants of the vehicle, and Rubin Smith was appropriately taken into custody.

While reporting the vehicle's license plate number, the officers watched as an occupant of the vehicle's front seat got out of the car and left the area. The officers did not attempt to arrest the vehicle's second occupant at that time. After receiving confirmation that the vehicle was stolen, and arresting Rubin Smith, the officers then toured the surrounding area in an attempt to locate the second individual. When they came upon Pipkins, Officer Tankersley maintains that he recognized Pipkins as the individual he had seen exit the car.

Officer Tankersley admits that he viewed the vehicle's occupants in a dimly lit parking lot, from as much as fifty feet away. He further admits that while he was watching the vehicle's occupant get out of the car and walk away, he was also attempting to read the vehicle's license plate, as well as drive his own patrol car. Plaintiffs use these facts to support their argument that there is a genuine issue of material fact as to whether Officer Tankersley did, in fact, recognize Pipkins as an occupant of the stolen vehicle on the night of his arrest.

However, Officer Tankersley did not rely solely on his own recollection in making the probable cause determination. Believing that he recognized Pipkins as the man who exited the stolen vehicle, Officer Tankersley then asked Rubin Smith to confirm his belief. Rubin Smith, who had actually been in the stolen vehicle, confirmed that Pipkins had been sitting in the front seat of the vehicle. Following Rubin Smith's identification of Pipkins, the officers attempted to effect his arrest. Plaintiffs have produced no evidence to contradict Officer Tankersley's account of these events.

There exists no genuine issue of material fact as to the information known to the officers when they determined that there was probable cause to arrest Pipkins. Based upon Officer Tankersley's identification of Pipkins as the occupant of what he knew to be a stolen vehicle, and on Rubin Smith's confirmation that Pipkins was, in fact, the second occupant, the officers were reasonable in their determination that they had probable cause to make an arrest.

### b. Qualified Immunity

 Even if the officers' determination were incorrect, they are entitled to immunity if, in light of clearly established law and the information the arresting officers possessed, a reasonable officer could have believed that there was probable cause to make an arrest. *Avery v. King,* 110 F.3d 12, 14 (6th Cir.1997) (citing *Hunter,* 502 U.S. at 227, 112 S.Ct. at 536). The officers are not to be held liable if their determination was mistaken, but rather only if it was unreasonable. *Johnson v. Estate of Mark A. Laccheo,* 935 F.2d 109, 111 (6th Cir. 1991) (citing *Anderson,* 483 U.S. at 641, 107 S.Ct. at 3039–40). Certainly a reasonable officer, knowing what Officers Tank-

ersley and Gibson knew, could have believed there was probable cause to arrest Pipkins. Therefore, with regard to Plaintiffs' unlawful arrest claim, Officers Tankersley and Gibson are entitled to judgment as a matter of law, and Count One of Plaintiffs' Complaint is hereby dismissed.

### 2. *Excessive Force*

#### a. **Constitutional Violation**

 Plaintiffs' second claim for relief, that Officers Tankersley and Gibson used excessive force in effecting Pipkins' arrest, must also be analyzed under the Fourth Amendment and its reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). Here the court must balance the nature and quality of the intrusion on the arrestee's Fourth Amendment interests against the countervailing governmental interests at stake. *Id.* at 396, 109 S.Ct. at 1871. Certainly, where an officer has probable cause to make an arrest, he or she also has the right to use some degree of physical coercion or the threat thereof to effect the arrest. *Id.* at 396, 109 S.Ct. at 1872. In deciding whether an officer has overstepped the boundaries of permissible force, the court must consider the facts of the particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest, and determine whether the totality of the circumstances justify the type of force used. *Id.*

 The court's reasonableness inquiry focuses on whether the officers' actions were objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying motives. *Id.* at 397, 109 S.Ct. at 1872. Allowance must be made for "the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97, 109 S.Ct. at 1872 (quotation omitted).

 Plaintiffs bear the burden of demonstrating that the force used by the officers was excessive, by presenting specific facts indicating that the officers acted unreasonably. *Smith v. Freland*, 954 F.2d 343, 345 (6th Cir.1992); *Miller v. Taylor*, 877 F.2d 469, 472 (6th Cir.1989). In the present case, Plaintiffs assert that Officer Tankersley applied a choke hold in attempting to subdue Pipkins. In support of their assertion, Plaintiffs present the testimony of Anthony Brown, a witness to the events, who stated that Officer Tankersley was on top of Pipkins, and had his arm around Pipkins' neck. Another witness, Rodney Gardner, testified that Officer Tankersley kneeled on Pipkins' back, holding his arm around Pipkins' neck, and that at least one of the officers kicked Pipkins as he lay on the ground. Confirming the testimony of these two witnesses, the Cuyahoga County Coroner, Elizabeth Balraj, M.D., testified that Pipkins died as a result of a cervical compression, and that hemorrhages were present which indicated that pressure was applied around the neck.

On the other hand, Officer Tankersley asserts that he did not apply a choke hold, but rather used his forearm to hold Pipkins' head down, as Pipkins was attempting to bite him. Officer Tankersley further asserts that, knowing he was in an area of high drug activity, he feared Pipkins might be HIV positive. Both officers assert that Pipkins was very strong, and that he violently resisted arrest. Finally, the officers maintain that they did not intend to use deadly force in effecting Pipkins' arrest.

The witnesses to the arrest agree that Pipkins struggled with the officers, though Rodney Gardner indicated that Pipkins' struggling could have been attributable to an attempt to gasp for air. Moreover, the witnesses agree that Pipkins stopped struggling after he was handcuffed, and lay motionless from that point on. It was after this point that the officers allegedly dragged Pipkins to the police car and "threw" him into the back seat, possibly causing his head to hit the opposite door.

Clearly there exists a genuine issue of material fact as to the type and amount of force used by the officers during the arrest. In addition, given the officers' claims that Pipkins continued to struggle throughout the ordeal, there exists a genuine issue of material fact as to whether Pipkins posed an immediate threat to the officers or others in the area. Such factual determinations are solely within the province of the jury. A reasonable jury could find that the officers violated Pipkins' constitutional rights.

### b. Qualified Immunity

The genuine issue of material fact which exists as to the amount and type of force used by the officers precludes this court from finding the officers immune to the second claim for relief. The court cannot find as a matter of law that the officers' conduct was reasonable for purposes of qualified immunity, and therefore denies the motion for summary judgment of Officers Tankersley and Gibson with regard to Count Two of Plaintiffs' Complaint.

### c. Municipal Liability

#### i. Failure to Train

■ Plaintiffs seek to hold the City of Cleveland liable based upon its alleged failure to adequately train its officers in the use of choke holds and neck restraints. In order to hold a municipality liable for its officers' alleged use of excessive force on a theory of failure to adequately train its officers, Plaintiffs must first show that the City's officers were, in fact, inadequately trained. Second, Plaintiffs must establish that the City's failure to adequately train its officers directly caused Pipkins' injuries. Finally, Plaintiffs must establish that the City was deliberately indifferent to a clear need for such training.

■ Plaintiffs must do more than show that Officers Tankersley and Gibson in particular were improperly trained. *City of Canton v. Harris,* 489 U.S. at 390, 109 S.Ct. at 1206. Moreover, even a showing that the injury to Pipkins could have been avoided had Officers Tankersley and Gibson received more or better training is insufficient. *Id.* at 391, 109 S.Ct. at 1206. Plaintiffs must demonstrate that the City's failure to adequately train its officers amounted to deliberate indifference:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

*Id.* at 390, 109 S.Ct. at 1205. Only then will the City's failure to train constitute a municipal custom or policy, exposing the City to liability for the officers' execution thereof.

The court first looks to whether the training provided by the City's police department regarding neck restraints was inadequate. Officer Tankersley testified that he was never taught not to apply choke holds. Sergeant Horvath, an in-

structor at the police academy, testified that it was his personal preference to advise recruits to "stay away from the neck," but that there was no official or unofficial policy which required him to do so. Plaintiffs' expert witness, Lou Reiter, points out at least one investigation file where an officer reports applying neck restraint which he refers to as a "departmentally approved restraining technique." Reiter Affidavit at ¶ 38. The Manual of Rules and Regulations, which provides guidelines for the use of firearms and other forms of deadly force, does not in any way address the types of holds and restraints which may be used by officers, and under what circumstances they should be used.

Plaintiffs' expert witness points to the controversy that has surrounded neck restraints since the early eighties when the courts were faced with deaths attributable to choke holds. *See City of Los Angeles v. Lyons*, 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Since that time, according to Reiter, added training in the use of neck restraints has been recommended throughout the law enforcement industry. Various surveys and reports cited by Reiter, all published prior to the incident in question in the present case, describe the dangers of improper neck restraint techniques. Reiter indicates that many agencies and training academies have mandated that neck restraint holds not be used, or, where neck restraint holds are permitted, the Lateral Vascular Neck Restraint hold is taught. The Ohio Peace Officer Basic Training Curriculum Suggested Lesson Plans, which are a suggested training format, allow agencies to train in the use of the Lateral Vascular Neck Restraint hold. Any reasonable training program, says Reiter, would at least include education as to the potential dangers of the hold and the necessity to provide notice to detention personnel once such a hold is applied, as well as constant medical attention to the detainee.

Reiter asserts that, based on his investigation, the City of Cleveland Police Department has made no official decision and has no written policy on whether or not neck restraint holds are to be used. No official decision was made as to whether or not officers should be trained to properly apply neck restraint holds, or admonished not to use them at all. Plaintiffs have presented sufficient evidence that a jury could conclude the City failed to properly train its officers in the application of neck holds and restraints.

Likewise, there is a genuine issue of material fact as to whether the City's alleged failure to train its officers in the use of neck restraints actually caused Pipkins' injuries. Dr. Balraj testified that Pipkins' death was the result of a cervical compression, and that the hemorrhages on his neck indicated that the officer's arm had been placed around Pipkins' neck. Dr. Reay's report, while indicating that the position of the officers on top of Pipkins was also significant in his injuries, could be read as consistent with Dr. Balraj's opinion that the pressure on his neck caused or contributed to his death.

Finally, reasonable jurors could find that the City of Cleveland knew that situations such as the instant case would arise, in which officers were faced with struggling arrestees, and were forced to decide just what amount and what type of force would be reasonable under the circumstances. Reiter testified, after reviewing police files, that there had been allegations of officers using choke holds in the past. Indeed, three of the files reviewed by Reiter alleged deaths resulting from choke holds, and 29 of the files alleged the use of some type of neck restraint. Finally, Sergeant Horvath submitted to his superiors a memorandum in 1977 touching on the subject of

neck restraints, stating that choke holds should not be used. Sgt. Horvath testified that he never recommended a policy prohibiting the use of choke holds within the department, because it was not within his authority to do so.

Viewing the evidence presented in a light most favorable to Plaintiffs, this court holds that a reasonable juror could find that the City of Cleveland failed to adequately train its officers in the use and/or advisability of neck restraints. Therefore, with regard to Plaintiffs' excessive force claim, based upon a theory of failure to provide adequate training, the City of Cleveland's motion for summary judgment is denied.

### ii. Failure to Investigate

As an alternative theory to support their claim of municipal liability for the officers' alleged use of excessive force, Plaintiffs argue that the City failed to exercise reasonable care in investigating and disciplining claims of police brutality in order to supervise its officers in the proper use of force. Plaintiffs rely primarily on the testimony of Lou Reiter, a former police officer who holds himself out to be an expert in, *inter alia,* administrative investigations resulting from police-involved deaths or serious injuries and citizen complaints alleging excessive force.

In *Fiacco v. City of Rensselaer,* 783 F.2d 319 (2nd Cir.1986), the Second Circuit upheld a jury verdict holding a municipality liable, accepting the theory advanced by the plaintiff therein that "the City was knowingly and deliberately indifferent to the possibility that its police officers were wont to use excessive force and that this indifference was demonstrated by the failure of the City defendants to exercise reasonable care in investigating claims of police brutality in order to supervise the officers in the proper use of force." *Id.* at 326. A plaintiff relying on a failure to investigate theory must still meet the deliberate indifference standard adopted by the Supreme Court in *Harris. Berry v. City of Detroit,* 25 F.3d 1342, 1354 (6th Cir.1994). The Fourth Circuit in *Spell v. McDaniel,* 824 F.2d 1380 (4th Cir.1987), also upholding a jury verdict of municipal liability, emphasized the "critical points" which must be established by a plaintiff asserting such a theory:

> The theor[y] [must] be carefully controlled at critical points to avoid imposing by indirection a form of vicarious municipal liability flatly rejected by Monell. Those critical points are (1) identifying the specific "policy" or "custom"; (2) fairly attributing the policy and fault for its creation to the municipality; and (3) finding the necessary "affirmative link" between identified policy or custom and specific violation.

*Id.* at 1389.

The first thing Plaintiffs must establish, in order to identify a municipal custom or policy, is that the City's actions, or inactions in this case, constitute deliberate indifference to the rights of its citizens. A failure to investigate in certain instances will not suffice. *Berry,* 25 F.3d at 1354. Moreover, even a showing that the City was grossly negligent in its investigation of incidents does not equate to deliberate indifference. *Id.* at 1353.

Assuming Plaintiffs can establish deliberate indifference on the part of the City, they must also demonstrate a causal link between the City's deliberate indifference and the constitutional violation which allegedly occurred in the instant case. In other words, the deliberate indifference exhibited by the City in failing to adequately investigate claims of use of excessive force by its officers must have proximately caused the death of Michael Pipkins. "Particularly when we deal with

sins of omission, as opposed to sins of commission, we should be certain the causal linkage is present that makes the omission the proximate cause of the wrong." *Id.* at 1348.

It is indeed a high threshold which the courts have set for Plaintiffs to overcome. Even where significant evidence has been presented indicating flawed investigatory procedures, courts still reject the failure to investigate theory where plaintiffs cannot demonstrate "tacit authorization by city policymakers." *Harris,* 489 U.S. at 397, 109 S.Ct. at 1209 (O'Connor, J., concurring in part and dissenting in part). For example, in *Berry,* the plaintiff's expert summarized statistical information of all shooting incidents for a particular year. The expert opined that the frequency of shootings could not be justified by self-defense. Of the 636 reports presented to him, plaintiff's expert reviewed 161 actual records. Of this number, the expert opined that 78 of the shootings were unjustifiable. He further concluded that out of the 161 incidents examined, only 15 officers were disciplined. The expert also presented several incidents in which officers were not disciplined, when he thought they should have been. The *Berry* court held that the evidence presented by the plaintiff did "not show a consistent pattern of ignoring constitutional violations" as would be required to establish deliberate indifference. *Id.* at 1354. The court contrasted the evidence presented in that case with that presented in *Spell* and *Fiacco,* two cases in which the plaintiffs succeeded on a failure to investigate theory:

In Spell, the plaintiff's evidence consisted of seven lay citizens testifying about brutality complaints they filed that resulted in no corrective action; eight present or former officers of the city police department testifying about a "code of silence" within the department and training in inappropriate methods of subduing suspects; an assistant state district attorney who had investigated and prosecuted officers for the use of excessive force; the former legal advisor to the police department who testified that he left the department because of an attitude favoring the use of excessive force; and internal records of the city police department showing frequent complaints about excessive force that were consistently dismissed or disregarded.

In Fiacco, the plaintiff offered evidence that the city's public safety board had adopted rules relating to police discipline, but that the police chief never had seen them. The rules required complaints to be in writing, yet did not provide a form for civilians to make a complaint. No hearings were held by the public safety board in the five years prior to the plaintiff's injury at the hands of the police.

Additionally, the plaintiff called as witnesses four of the six citizens who had actually lodged complaints against officers. Each citizen testified to being physically abused by an officer and complaining to the chief of police. The chief investigated the complaints on his own by simply talking to the officer involved. No investigatory file was created, no formal statement or disciplinary action was taken, and there was not even so much as a note placed in the officers' personnel files.

*Id.* at 1355 (citations omitted). The *Berry* court held that the evidence presented in *Spell* and *Fiacco* stood in "stark contrast" to the evidence with which it was faced. *Id.*

In support of their motion for summary judgment, Defendants present the affidavit of Sgt. Adrian Candelaria, a member of the Internal Affairs Section of the Cleve-

land Police Department, who authenticates the Manual of Rules and Regulations. As for the reporting of the use of deadly force, the Manual provides:

> An officer using any type of deadly force (whether or not such use involves a death or injury) shall immediately notify his superior officer and promptly make a written report giving full particulars. A complete investigation shall be made of the incident and reports forwarded through channels.

The Manual further dictates that the Use of Deadly Force Investigation Team shall:

> Conduct an objective, impartial, and complete investigation and review of the facts of the use of deadly force by police officers. It shall expeditiously report to the Chief of Police, setting forth the facts of the incident including any violation of law or Department Rules and Regulations found to have occurred.

In addition, Plaintiffs do not dispute Defendants' assertion that there exist written policies in the form of General Police Orders, which provide for the processing of evidence, conducting of interviews, and complete investigation of all incidents where serious physical harm is caused by an officer's use of force.

In response to discovery requests, Defendants made available for Reiter's review 73 investigation files from the Use of Deadly Force Investigation Team ("UD-FIT") covering the period from 1988 to 1993, 67 investigation files from the Office of Professional Standards ("OPS") covering the period from 1991 to 1992, and 76 investigation files from the Complaint Investigation Unit ("CIU") from 1992, all of which contained allegations of the use of excessive force. Of the 216 files presented to him, Reiter personally reviewed 48 of the UDFIT files, plus three such files which involved neck restraint or positional death issues. Reiter also reviewed 58 of the OPS and CIU files. Of these, 29 were files which specifically involved allegations of neck restraint holds, 4 were files which involved either Officer Tankersley or Officer Gibson, and 25 were files chosen by pulling every fifth file as they appeared in the boxes of files produced by Defendants. Reiter indicated that he felt his review of these files was "sufficient for a reasonable evaluation of the practices of the Cleveland Police Department in this area."

After reviewing the files, Reiter stated in his expert report that:

> The Cleveland Police Department, in my opinion, has systemic deficiencies in its administrative investigations of use of force, in-custody injuries and misconduct, and citizens' complaints alleging improper use of force. These systemic deficiencies were so pervasive and pretextual that any reasonable officer in such a police agency would be aware of the significant failures of these critical administrative investigations and would feel comfortable that field misconduct, particularly use of unreasonable force, would not be discovered, would be minimized or would not result in any significant sanction. These systemic failures by the Cleveland Police Department appeared to be conscious departures from generally accepted practices within law enforcement.

Reiter Affidavit at ¶ 8.

As an initial matter, the court notes that while Plaintiffs charge a failure to properly investigate and discipline, Reiter does not express an opinion as to the adequacy of the City's disciplinary response to the officers' actions at issue in this case. Reiter Dep. at 118. Moreover, Reiter does not believe that lax discipline caused Pipkins' death. *Id.* at 98. Rather than address the City's disciplinary policies and procedures, about which Reiter concedes he knows very little, *id.* at 110–115, Reiter's opinions

revolve primarily around the City's investigations:

> I talk about administrative investigations. In fact, I don't think I even used the term "discipline" in that. In fact, the word "discipline" is not there. . . .

*Id.* at 116. According to Reiter, reasonable officers in the Department are aware that claims of excessive force will not be investigated or will be inadequately investigated, and therefore they are more likely to use excessive force, without fear that they will be disciplined.

Reiter lists several deficiencies which he claims to be present in some of the investigative files he reviewed. First, Reiter notes that in the files he reviewed, only one officer was disciplined for improper use of force. Second, 18 of the CIU and OPS files Reiter reviewed were deemed "administratively withdrawn" without any definitive adjudication. In these cases, investigations were closed for various reasons, usually involving inability to locate or contact the complainant.

Also presented in Reiter's report is a chart listing other perceived "investigatory deficiencies," and the percentage of files which exhibited each deficiency. He then provides percentages of cases in which each deficiency occurred, and examples of each type of deficiency. The categories set out by Reiter were: (1) unexplained delay of six months or longer; (2) deficient interviews; (3) failure in witness search/contact; (4) failure to use reasonable evidence; (5) disposition accepts officers' version of events over citizens' version; (6) disposition contrary to investigation; and (7) failure to address force issues. Reiter maintains that most of the files he reviewed had at least one investigatory deficiency, and numerous files had three or more.

For instance, according to Reiter's calculations, 31% of the choke hold investigations were inexplicably delayed for more than six months. Of the CIU and OPS investigations Reiter reviewed, 24% were delayed. The court in *Cox v. District of Columbia*, 821 F.Supp. 1 (D.D.C.1993), addressed the issue of delayed investigations, and held that the District of Columbia had a policy of delaying investigation and discipline, which encouraged police misconduct. However, the plaintiff in *Cox* presented evidence that the review board which investigated claims of excessive force had a "systematic backlog" of complaints which caused almost all such claims to be delayed for years. *Id.* at 19. As an example of the egregious nature of the situation presented by that plaintiff, in 1987 the board issued a list of 1,450 cases which remained unresolved. *Id.* at 7. The court found that the "consistent and chronic delays endemic to the . . . review process", *id.* at 12, constituted a custom and practice of deliberate indifference to the rights of individuals who came into contact with the city's officers. *Id.* at 13.

The court distinguished the District of Columbia Circuit's ruling in *Carter v. District of Columbia*, 795 F.2d 116 (D.C.Cir.1986), wherein that court held that the statistics presented by the plaintiff were "too general to prove any pattern or policy, and their specific instances were too scattered and lacking in detail to build a case." *Carter*, 795 F.2d at 124. The instant case is more similar to *Carter* than to *Cox*. First, Reiter's testimony indicates that an average of 28% of the investigations he reviewed were inexplicably delayed. This figure is nothing like the situation in *Cox*, where virtually all complaints were delayed for years. Second, while Reiter points to delays in investigations, he does not indicate how the delayed investigations were resolved. In *Cox*, the delays meant that almost no action was ever taken against the officers. Reiter's testimony

with regard to occasional unexplained delays, while indicating that the existing procedures were not necessarily executed to perfection, simply does not indicate a "history of widespread abuse that has been ignored by the City." *Berry*, 25 F.3d at 1354.

The other investigatory deficiencies asserted by Plaintiffs are likewise insufficient to establish deliberate indifference. For instance, Reiter asserts that in 20% of the cases, the disposition was contrary to the investigation. Again, 20% is hardly indicative of the pattern necessary to show deliberate indifference. Moreover, even if in some instances the disciplinary measures taken were not, in Reiter's opinion, commensurate with the results of the investigation, "at best, it shows that discipline was not as frequent or as severe as [plaintiffs] would have liked. It does not show a consistent pattern of ignoring constitutional violations." *Berry*, 25 F.3d at 1354.

Reiter viewed the "deficient interviews" category as the "most significant and glaring flaw in the system." Indeed, Reiter testified that an average 72% of the files he reviewed exhibited this deficiency. Within this category Reiter includes everything from requiring complainants to come to the Justice Center in order to be interviewed; to asking pointed questions and requesting clarifications; to not interviewing some witnesses. So many different types of deficiencies are lumped together in Reiter's "deficient interviews" category as to render his percentage almost meaningless. In addition, it is far from clear that some of the examples he cites are deficiencies at all. Reiter does not indicate that no witnesses were ever interviewed, or that the police department as its routine never interviews witnesses. In his examples of deficient interviews, statements were taken from complainants, and from officers involved.

With each deficiency he cites, Reiter points out what could have been done to make the investigation more thorough and more complete. Reiter establishes that the City's investigation of complaints is not ideal, and does an admirable job of pointing out the ways in which that is so. But while the City's "complaint handling procedures ... may fall some distance from the ideal ... they do not spell a deliberate 'see no evil' policy." *Carter*, 795 F.2d at 124. It may even be said that in some of the cases cited by Reiter the investigations were conducted in a negligent manner. Negligence is not enough. Random flaws in the administrative process, albeit sometimes serious, may indicate an inconsistent or imperfect system, but do not rise to the level of deliberate indifference to citizens' constitutional rights.

Even if Plaintiffs could establish a custom or policy of deliberate indifference, they still cannot establish that the City's alleged deliberate indifference was the "moving force" behind the actions of Officers Tankersley and Gibson. The *Spell* court set forth the strict causation requirement:

> [A] policy or custom that is not itself unconstitutional ... must be independently proven to have caused the violation. Proof merely that such a policy or custom was "likely" to cause a particular violation is not sufficient; there must be proven at least an "affirmative link" between policy or custom and violation; in tort principle terms, the causal connection must be "proximate," not merely "but-for" causation-in-fact.

*Spell*, 824 F.2d at 1387–88.

Plaintiffs attempt to show causation by arguing that the Cleveland Police Department suffers from:

systemic deficiencies ... so pervasive and pretextual that any reasonable officer in such a police agency would be aware of the significant failures of these critical administrative investigations and would feel comfortable that field misconduct, particularly use of unreasonable force, would not be discovered, would be minimized or would not result in any significant sanction.

Reiter Affidavit at ¶ 8. Based on Reiter's report, Plaintiffs cannot show that any alleged deliberate indifference on the part of the City was the moving force behind the actions of Officers Tankersley and Gibson. First, it cannot be assumed that the officers were aware of investigatory deficiencies, given the low percentages presented in most of Reiter's categories. Second, based solely upon the low occurrence of investigatory deficiencies, it cannot be assumed that reasonable officers would tailor their actions according to the supposition that they would not be disciplined.

For instance, while Reiter indicates that 31% of choke hold investigations were inexplicably delayed for more than six months, Reiter does not show that officers were aware of any significant delays in investigations, or that delays in investigations necessarily led to failure to discipline officers. Indeed, according to Reiter's figures, 69% of investigations were handled in a timely manner. Reiter assumes that a reasonable officer would feel comfortable using excessive force, based upon slim odds that his actions would go unpunished. Likewise, even where Reiter indicates that an average of 72% of the investigations exhibited deficient interview techniques, Reiter assumes that a reasonable officer would resort to excessive force, hoping that in his particular case, a witness would be overlooked, or a complainant would withdraw his or her complaint.

The primary goal in setting such stringent requirements for establishing municipal liability for police misconduct is "to avoid the indirect or inadvertent imposition of forms of vicarious liability rejected in Monell." *Spell,* 824 F.2d at 1391. Plaintiffs in the case *sub judice* cannot establish that there was a persistent, pervasive practice, attributable to a course deliberately pursued by official policy-makers, which caused the deprivation of Pipkins' constitutional rights. Absent such a course of conduct on the part of the City of Cleveland, to hold the City liable under a failure to investigate theory would be to hold the City liable solely for the actions of its employees. Accordingly, with regard to Plaintiffs' failure to investigate theory, the City of Cleveland is entitled to judgment as a matter of law.

### 3. *Indifference to Medical Needs*

#### a. **Constitutional Violation**

██ In Count Three of their Complaint, Plaintiffs charge Officers Tankersley and Gibson with deliberate indifference to Pipkins' medical needs, in violation of his Eighth Amendment right to adequate medical assistance while in police custody. "Where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness anyone who is incarcerated, whether for a term of life or merely for the night to 'dry out' in the local drunk tank, has the due process right to adequate medical care." *Rich v. City of Mayfield Heights,* 955 F.2d 1092, 1096 (6th Cir.1992) (quotations omitted). In order to establish such a violation, Plaintiffs must show that the officers, acting with deliberate indifference, exposed Pipkins to a substantial risk of serious damage to his health. *Farmer v. Brennan,* 511 U.S. 825, 828–29, 114 S.Ct. 1970, 1974, 128 L.Ed.2d 811 (1994).

■ Deliberate indifference is only established where the defendant was subjectively aware of the risk. *Id.* at 828, 114 S.Ct. at 1974. More than simple negligence, deliberate indifference results only when an official knows of and disregards an excessive risk to health or safety. *Id.* at 837, 114 S.Ct. at 1979. The Sixth Circuit has held that:

> The standard for establishing deliberate indifference is rather demanding. The detainee must show that the government actor was both aware of the facts from which an inference could be drawn that a substantial risk of serious harm exists and actually drew that inference. Thus, government actors can avoid liability by proving that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.

*Butler*, 93 F.Supp.2d at 867 (citing *Farmer*, 511 U.S. at 837–38, 114 S.Ct. 1970).

■ In order to prove that Officers Tankersley and Gibson were deliberately indifferent to Pipkins' need for medical attention, Plaintiffs must show that the officers were aware of the facts which gave rise to a serious risk to his health. Plaintiffs present the testimony of Dr. Balraj, who indicated it was her opinion to a reasonable degree of medical certainty that Pipkins lost consciousness while he was still on the ground, before he was ever put into the patrol car. In addition, both Anthony Brown and Rodney Gardner testified that Pipkins stopped struggling after being released from the alleged choke hold, and appeared to be unconscious. The eyewitnesses also testified that, rather than help Pipkins to his feet, the officers picked him up by his arms, dragged him to the patrol car and "threw" him into the back seat.

While the officers were en route to the police station, Officer Tankersley has testified that Pipkins did not make any sounds. Officer Gibson, on the other hand, testified that Pipkins made coughing, gagging and spitting noises. According to the officers it was out of concern for Rubin Smith's safety that they stopped the car and removed Smith from the back seat. Rodney Gardner indicates that at that time one of the officers leaned his entire upper body into the back seat, and looked as though he was "checking" on Pipkins.

Upon arrival at the station, the officers assert that they pulled Pipkins out of the car, and held him under the arms as they walked into the station. Pipkins suddenly slouched to the ground, and became heavier. According to the officers it was at this time that they called out for help, and the Emergency Medical Service squad arrived within minutes.

The affidavit of Josetta Coleman tells a much different story. Ms. Coleman, who was in a cell at the Fourth District police station, maintains she watched as two officers dragged Pipkins into a cell by his shirt collar. He appeared to Ms. Coleman to be unconscious. It was not until fifteen minutes later that an officer returned to the cell, checked Pipkins' chest and announced that Pipkins was dead.

"Whether a [defendant] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842, 114 S.Ct. at 1981. Viewing the evidence in the light most favorable to Plaintiffs, it is clear that a reasonable jury could find that the officers knew of the

facts which gave rise to a substantial risk to Pipkins' health, were deliberately indifferent to that risk, and thus violated Pipkins' Eighth Amendment rights.

### b. Qualified Immunity

The court then examines whether the constitutional right allegedly violated was "clearly established" for purposes of qualified immunity. Pipkins' right not to have his serious medical needs treated with deliberate indifference, or stated even more particularly, his "right to have medical assistance summoned immediately upon the police officers becoming aware that he was in need of immediate medical care," was clearly established when the alleged violation took place. *See Williams v. Mehra,* 186 F.3d 685, 691 (6th Cir.1999); *Rich,* 955 F.2d at 1097.

Just as questions of fact preclude a determination as to whether Officers Tankersley and Gibson were aware of Pipkins' medical condition, so do these questions preclude a finding that the officers acted reasonably in violating Pipkins' clearly established Eighth Amendment rights.

### c. Municipal Liability

■ The question of whether the City of Cleveland may be held liable for deliberate indifference to medical needs is an easier one. Plaintiffs state in their Complaint that the City of Cleveland and its police department, "through their policy makers, adhered to a custom, policy and practice of deliberate indifference to the constitutional rights of persons in police custody by failing to establish policies, instruct, train or supervise its police officers regarding the detection and treatment of persons in police custody with serious medical needs by failing to investigate and discipline police officers' failure to respond to the serious medical needs of persons in police custody." Complaint at ¶ 107. Plaintiffs present no evidence whatsoever as to the City's policy, or lack

thereof, regarding the detection and treatment of persons in custody. Plaintiffs' expert witness, Lou Reiter, while providing voluminous testimony on the subject of neck restraints, their permissibility, and the proper training which should be provided, does not address the subject of training officers to recognize medical needs.

Plaintiffs are unable to show that there is a municipal policy or custom regarding inattention to medical needs, whether it consists of a failure to train, failure to investigate, or failure to discipline its officers, which in any way contributed to the death of Michael Pipkins. Indeed, Plaintiffs' devote a mere one paragraph of their brief in opposition to summary judgment, which is bereft of factual allegations and citations to legal authority, to the issue of municipal liability for deliberate indifference to medical needs. To hold the City of Cleveland liable on this claim would be to hold it liable for the alleged transgressions of its police officers, solely on a respondeat superior theory. As discussed in detail *supra,* such a theory is impermissible. Accordingly, the court grants summary judgment in favor of the City of Cleveland on Plaintiffs' claim for deliberate indifference to medical needs.

### 4. *Conspiracy*

Count Four of Plaintiffs' Complaint charges Officers Tankersley and Gibson with conspiracy to interfere with civil rights, pursuant to 42 U.S.C. § 1985(3), which provides, in pertinent part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities

of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages, occasioned by such injury or deprivation, against any one or more of the conspirators.

In order to support a claim under § 1985(3), Plaintiffs must establish: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; and (4) an injury to either person or property or a deprivation of any right or privilege of a United States Citizen. *Volunteer Medical Clinic, Inc. v. Operation Rescue*, 948 F.2d 218, 223 (6th Cir.1991) (citing *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828–29, 103 S.Ct. 3352, 3355–56, 77 L.Ed.2d 1049 (1983)). Furthermore, it has long been established that "a necessary element of a § 1985(3) claim is the existence of some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Id.* (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S.Ct. 1790, 1798, 29 L.Ed.2d 338 (1971)).

Plaintiffs concede in their brief in opposition that discovery has revealed no racial animus on the part of Officers Tankersley and Gibson. Nor have they identified any other protected class within which Pipkins may have been included, and upon which discriminatory animus could have been based. Plaintiffs' conspiracy claim fails on that basis alone. Moreover, Plaintiffs have not presented any evidence whatsoever which would support the assertion that Officers Tankersley and Gibson engaged in a conspiracy.

Plaintiffs point this court to *Hafner v. Brown*, 983 F.2d 570 (4th Cir.1992), in which the Fourth Circuit upheld a district court's jury instruction that a police officer's mere acquiescence could amount to a conspiracy agreement where "one police officer watches an open breach of the law and does nothing to seek its prevention." *Id.* at 578. The *Hafner* court addressed the elements of a civil conspiracy claim under 42 U.S.C. § 1983, *id.* at 576, as opposed to a conspiracy under 42 U.S.C. § 1985(3), which Plaintiffs allege in the instant case. In addition, Plaintiffs fail to acknowledge that the very instruction which the *Hafner* court upheld also provided that, "The critical element is whether there was a meeting of the minds to accomplish the unlawful act." *Id.* at 577. Plaintiffs have presented no evidence of a meeting of the minds between Officer Tankersley and Officer Gibson, or any kind of agreement to work in concert to deny Pipkins equal protection. Accordingly, Defendants' motion for summary judgment is granted with regard to Plaintiffs' conspiracy claim, and Count Four of the Complaint is hereby dismissed.

### V. STATE CLAIMS

Plaintiffs' survival and wrongful death claims, both based in state law, remain pending only against Officers Tankersley and Gibson. The officers urge that they are entitled to summary judgment with regard to both claims, based upon the Political Subdivision Tort Liability Act, Ohio Rev.Code § 2744.03, which provides immunity to political subdivisions and their

employees under certain circumstances. Under § 2744.03, Officers Tankersley and Gibson, as employees of the City, are immune to civil liability where they are exercising governmental or proprietary functions. *Nungester v. City of Cincinnati,* 100 Ohio App.3d 561, 654 N.E.2d 423, 426 (1995).

However, § 2744.03 specifically provides that one exception to immunity takes effect when the defendant's acts or omissions "were with malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev.Code § 2744.03(A)(6); *Nungester,* 654 N.E.2d at 426. Defendants urge this court to hold that, as a matter of law, Officers Tankersley and Gibson do not fall within the exception.

This court is faced with testimony from various witnesses that the officers "threw" a man who appeared to be unconscious into their patrol car, possibly causing him to hit his head and possibly closing the car door on his legs. The court has further reviewed testimony indicating that the officers dragged his lifeless body into a cell, leaving him there for at least fifteen minutes before summoning any medical assistance. Based upon this court's holdings above, specifically within the context of Plaintiffs' excessive force claim, when this court construes the facts in the light most favorable to Plaintiffs, a reasonable juror could conclude that Officers Tankersley and Gibson acted in a wanton or reckless manner. Accordingly, Officers Tankersley and Gibson are not entitled to summary judgment on their claim of immunity pursuant to § 2744.03 regarding Counts Five and Six of Plaintiffs' Complaint.

## VI. *CONCLUSION*

For the foregoing reasons, the Motion for Summary Judgment of Defendants Michael Tankersley and Jeffrey Gibson (Doc. No. 182) is granted in part and denied in part, the Motion for Summary Judgment of Defendants City of Cleveland, Mayor Michael White, Carolyn Allen and Edward Kovacic (Doc. No. 183) is granted in part and denied in part, Plaintiffs' Motion to Strike Exhibit D to Defendants City of Cleveland, Mayor Michael White, Carolyn Allen and Edward Kovacic's Motion for Summary Judgment (Doc. No. 186) is granted, and Defendants' Motion to Quash Partial Deposition Testimony of Plaintiffs' Expert Witness and for Protective Order (Doc. No. 192) is withdrawn in part and granted in part.

Counts One and Four of the Complaint are hereby dismissed. Count Two remains pending against Officer Tankersley, Officer Gibson, and the City of Cleveland. Count Three is dismissed solely with regard to the City of Cleveland, and remains pending against Officer Tankersley and Officer Gibson. Counts Five and Six also remain pending against Officer Tankersley and Officer Gibson.

IT IS SO ORDERED.